Haynes *vs.* The State.

DENNIS E. HAYNES, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant.

[1.] As to how far the credit of impeached witnesses may be considered as restored, depends much upon the *nature* as well as the *extent* of the corroborating testimony, viz: whether they be corroborated as to the *main*, rather than as to immaterial facts; also, to the number of particulars in which they are corroborated.

[2.] To reduce a homicide from murder to manslaughter, the slayer is not obliged, before the mortal wound is given, to *retreat* from his domicil or his family.

[3.] If one entitled to the joint use of a well, go there to draw water for his family, and upon a sudden affray, in the heat of passion, take the life of the other joint-tenant, in consequence of a sudden violent attack made upon him by the latter, the killing will be manslaughter, unless made necessary to save himself from death or some great bodily harm.

[4.] Before the law of necessity can exist, a cause of necessity must exist.

[5.] To constitute justifiable homicide, se *defendendo*, the slayer must be faultless; he must owe no duty to the deceased—be under no obligation of law to make his own safety a *secondary* object; otherwise, he is amenable to the law of the land, without any immunity under the shield of necessity.

[6.] This Court stands pledged, by its past history, to abolish, to the extent of its power, all exclusionary rules which shut out any fact from the Jury which may assist them in the ascertainment of the truth of the issue committed to their trial and decision.

Murder, in Fulton Superior Court. Tried before Judge WARNER, October Term, 1854.

While impannelling the Jury in this case, the State put upon the prisoner one Reuben Haynes, and also one William McWilliams, without first administering either the oaths prescribed by the Statute of December, 1843, or the oath prescribed by the Act of 1853, to wit: "Have you any conscientious scruples with regard to capital punishment." The bill of exceptions states that the prisoner accepted both the Jurors, without requesting the oaths to be administered.

The State also put upon the prisoner one Thomas A. Wil-

liams, who was accepted by the prisoner, and was required to be sworn in chief. Before the oath, in chief, was administered, the Juror, himself, voluntarily stated to the Court that he was under the age of twenty-one years; and for this cause, he was set aside by the Court, "without the consent, and contrary to the express wish of the prisoner." J. W. Cason one of the tales Jurors, before he was put upon the prisoner, stated under oath, that he had a sick child at home who required his personal attention; and for this reason, asked to be discharged from serving as a Juror. The Court excused this Juror, without the consent of the prisoner.

After the bill of indictment was read to the Jury, the case opened by the Solicitor General, and a portion of the evidence on the part of the State had been received, "a Juryman by the name of Robert W. Fleming was, by the Court, and without the consent of the prisoner, permitted to separate from his fellow-Jurors, under the charge of a Bailiff sworn to attend him, and go to his house in the city, and there remain some two hours, under the charge of the Bailiff, and then return to the Jury, the said Juror having first sworn, that he had then a sick child at home who required his personal attention."

Among the *triors* appointed by the Court, was a Mr. Beman, an Attorney at Law then residing in Atlanta, Fulton County; *after the trial was over,* it was made to appear to the Court, that Mr. Beman had not resided in Atlanta six months, and not more than three or four months, before the trial.

After the first forty-eight persons summoned as Jurors were disposed of, other tales Jurors were summoned by the Sheriff; and out of which second set of tales Jurors, the balance of the Jury was made up.

After the evidence and the argument closed, the Counsel for the prisoner asked the Court to charge the Jury as follows:

1st. We ask your honor to charge the Jury, that although drunkenness will not *excuse* the commission of a crime, and although "a prisoner can derive no privilege from madness voluntarily contracted by him;" yet, voluntary drunkenness upon

an indictment for murder, " the intoxication of defendant may be taken into consideration as a circumstance, to show the act was not premeditated."

2d. We ask your Honor to charge the Jury, that a threat made under excitement, no matter from what cause this excitement emanated, will not authorize a Jury to presume that an act done after that threat made was deliberately done, and that a homicide committed without any mixture of deliberation whatever, cannot be murder in the law.

3d. We ask the Court to charge the Jury, though voluntary drunkenness cannot excuse from the commission of crime ; yet when, as upon a charge of murder, the question is, whether the act done was *premeditated* or done only from sudden heat and impulse, the fact of the party being intoxicated, has been held to be a circumstance proper to be taken into consideration.

4th. That being intoxicated is no excuse for *crime ;* yet evidence of drunkenness may be admissible to the question of malice, to show the character of the homicide.

5th. We request your Honor to charge the Jury, that if the prisoner was sensible of what he was about to do and did the act *intentionally*, still, if the Jury are satisfied, from the evidence, that the killing was the result of a fear for his life or enormous bodily harm induced by the improper unlawful act of deceased at the time of the killing, still, the Jury must, from the evidence, determine whether this homicide was the result of *malignity of heart*, or whether it was imputable to human infirmity.

6th. That if the Jury believe, from the evidence, that Haynes had been put in possession of this well and premises, Haynes was not, by the law, compelled to run from a trespasser, leaving his property to the mercy of the trespasser; but that, by the law, he may legally oppose force to force, and that he may legally oppose whatever force the pressure of the circumstances demanded, to prevent a felony or to prevent some serious, dangerous, bodily harm.

7th. That if the prisoner, when at the well, was where he had a legal right to be, that he had a right to remain there

and there protect his property or his person; and in such case, he is not obliged to retreat, but may legally pursue his adversary until he finds himself out of danger; and if, in such a conflict, Haynes killed Griggs, it was justifiable.

## CHARGE OF THE COURT:

This is a case, The State *vs.* Dennis E. Haynes and George Lofton and John M. Brown, for murder—and the prisoner, Haynes, having severed on the trial, you will consider this case as against Haynes only. You have listened patiently and attentively to the argument of Counsel. It now remains for the Court to give you its views of the law which it deems applicable to the case. You are judges of the law as well as the facts. I desire your attention while I endeavor, as clearly and concisely as I can, to give you my view of the law, but you are not *absolutely* bound by the law as given in charge by the Court. You have the right to be judges of it yourselves. You are the exclusive judges of the facts detailed by the witnesses. The indictment is before you. It alleges that Dennis E. Haynes, on a certain day mentioned in the bill of indictment, at a certain place mentioned therein, did of his malice aforethought, unlawfully, wilfully and feloniously kill and murder James E. Griggs. To this charge the prisoner has plead not guilty, and thus has an issue been made up in which the State holds the affirmative. The State must *fully* prove the prisoner's guilt, as charged in the bill of indictment, which you will have before you. The State, I say, must fully prove the guilt beyond a reasonable doubt, of the crime as charged, before you can find him guilty. Permit the Court to call your attention to some of the rules of evidence as applicable to this case. It is the province of the Court to decide upon the admissibility of evidence. It is your province to judge for yourselves, what facts that evidence establishes. You are exclusively to judge as to the weight of the evidence and the credibility of the witnesses. Prisoner's Counsel contend that some of the witnesses have been impeached. One mode of impeaching witnesses is to introduce other witnesses, who testify that they are acquainted

with the general character of the witness for truth and veracity in the neighborhood in which he lives, and from their knowledge of that character they would not believe the witness on his oath in a Court of Justice. If any witnesses have been thus impeached, you have the right to set their testimony aside entirely; and it is your duty to do so unless the testimony of such witness is corroborated by other witnesses, whose credibility has not been attacked; and corroborated, you will give it such weight as you may think it entitled. The credit of a witness may be materially affected or totally destroyed by the manner of giving evidence, as by an inconsistent statement of facts, &c. As to the doctrine "*false in one point false in all,*" if a witness swear *wilfully* false in one material point, you may disregard his entire testimony, unless corroborated by the evidence of some unimpeached witness or witnesses, unless it be attributed to mistake or inadvertence, want of memory, &c. If there has been any evidence in this cause impeached by any of these rules, you are at liberty to believe or disbelieve it, as you think proper. An accomplice, or one indicted in the same indictment, not on his trial, is a competent witness—as to his credibility, this is a matter entirely for you to consider—take into consideration his relative position to the case.

The Court charges you that the fact of his being indicted as an accomplice, is a circumstance against his credibility. The weight to be given to such testimony, you must judge exclusively for yourselves. Where a threat is proven to have been made and susceptible of two constructions, the one an innocent, the other a criminal construction, the rule is, that you should give such threat that construction most favorable to the prisoner. But if you believe any threat was made by the prisoner which is only susceptible of a criminal construction, you should give that construction. You are the exclusive judges of this matter.

"A crime or misdemeanor shall consist in a violation of a public law, in the commission of which there shall be a union or joint operation of act and intention or criminal negligence."

"A person shall be considered of sound mind, who is neither

an idiot, a lunatic or afflicted by insanity, or who hath arrived at the age of fourteen years, or under that age, if such person knew the distinction between good and evil." "Drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness was occasioned by the fraud, artifice or contrivance of other person or persons, for the purpose of having crime perpetrated, and the person or persons so causing said drunkenness for such malignant purpose, shall be considered a principal, and suffer the same punishment as would have been inflicted on the person or persons committing the offence, if he, she or they had been possessed of sound reason and discretion." "Homicide is the killing of a human being of any age or sex, and is of three kinds—murder, manslaughter and justifiable homicide."

Before you can find the prisoner guilty of any offence, you must be satisfied, from the evidence, that there was a killing. Is Griggs dead? If so, from the evidence, who was the slayer? If you are satisfied on these two points, viz : that Griggs is dead, and that prisoner is the slayer, then you may inquire what kind of homicide has been perpetrated in this case—murder, manslaughter or justifiable homicide? "Murder is the unlawful killing of a human being in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either express or implied." The killing must be unlawful. Justifiable homicide would not be an unlawful killing. Then what is malice? "It is of two kinds—express and implied. Express malice is that deliberate intention, unlawfully to take away the life of a fellow-creature, which is manifested by external circumstances capable of proof." Malice shall be implied when no considerable provocation appears, and when all the circumstances of the killing show an abandoned and malignant heart. There can be no murder without malice, either express or implied. You have heard what malice is. There must be a *deliberate* intention, *unlawfully* to take away life, to constitute murder ; a *deliberate design unlawfully* to kill. For instance, express malice may be shown by previous threats *to take away the life of another*, made *recently before the kill-*

Haynes *vs.* The State.

*ing.* Implied malice may be illustrated as I did it a few days ago, in charging the Jury in another trial for murder then before this Court: As if one were furiously to ride or drive through a crowded street, and carelessly kill a person by riding or driving over him, though there might not have been a deliberate intention to kill; yet, his conduct, evincing such reckless disregard of human life, malice might be implied. Now it is for you to say whether Griggs is killed; if so, by whom? And if you find, from the evidence, that prisoner killed the deceased, and that the killing was done with malice, either express or implied, then you ought to find the prisoner guilty of murder.

" Justifiable homicide, is the killing of a human being by commandment of the law, in execution of public justice—by permission of the law, in advancement of public justice—in self-defence or defence of habitation, property or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony upon either; or against any persons who manifestly intend or endeavor, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or living therein." Now it is contended by prisoner's Counsel, that this is a case of justifiable homicide. This is a question for you to determine for yourselves, under the law and the evidence. To prevent a mere trespass, is not sufficient to justify a homicide. Homicide is not justifiable unless the killing is to prevent the party killed from committing a felony. (Here the Court stated to the Jury what constitutes a felony under the law.) If, after persuasion, remonstrance or other gentle measures used, a forcible attack and invasion on the property or habitation of another cannot be prevented, it shall be justifiable homicide to kill the person so attacking or invading the property or habitation of another; but it must appear that such killing was absolutely necessary to prevent such attack or invasion, and that serious injury was intended or might accrue to the person, property or family of the person killing.

If a person kill another in his defence, it must appear that

the danger was so urgent and pressing, at the time of the kill-ing, that in order to save his own life, the killing of the other was absolutely necessary; and it must appear also, that the person killed was the assailant, or that the slayer in good faith endeavored to decline any further struggle before the mortal blow was given. All other instances which stand upon the same footing of reason and justice as those enumerated, shall be justifiable homicide. A bare fear of any of these of-fences, to prevent which this homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears, and not in the spirit of revenge. Take all the circumstances into consideration. Where was it? Who was there? Why was the prisoner there? For what purpose? What did he do? What did deceased *manifestly intend to do?* Did he intend to commit a felony? If you believe deceased intended to commit a felony on the prisoner, his property or habitation, then prisoner was justifiable. Was there any felony perpetrated or intended to be perpetrated? Were rocks thrown? Did they hit prisoner, or fall harmless at his feet? Was deceased rushing on him with a weapon likely to produce death? Was a felony in-tended to be committed? Was it necessary to take Griggs' life, to prevent the felony, or did the prisoner have reason to *apprehend* that Griggs intended to inflict upon prisoner some serious bodily harm; and did prisoner really act under the in-fluence of these fears, and not in the spirit of revenge? A bare fear will, in no case, justify a killing. What did Griggs do? What weapons did he use? Did Haynes retreat? Did Griggs assault Haynes with rocks or pole? Was the danger urgent? So urgent that Haynes could not retreat? In the opinion of the Court, Haynes was not justifiable in taking Griggs' life, if he could have avoided it by a retreat in safety. Was he influenced by fear at the time of the killing, or was he actuated by deliberate revenge? Had Haynes, as a reasonable man, reason to apprehend danger of his life—did he act un-

der these fears ? If he could have retreated and did not, in the opinion of the Court, this is not justifiable homicide. The danger must have been urgent and pressing, and there must be such circumstances as would justify a reasonable man in so believing. As has been read by Counsel, (*Lelfrede's case,*) in the case of the person who with the pistol loaded with powder only. If Griggs acted so as to alarm the fears of a reasonable man, and to justify a reasonable man in the belief that his life was in danger, even though it was not; still, if the prisoner acted under the influence of such fears, then is he justifiable.

As to that which took place at the house previous to the day of the killing, that is to be considered by you only so far as to ascertain whether there was malice or not in the prisoner. If there was any such provocation as would justify pris.; yet, if he had had time to cool, after provocation, before the killing, then such provocation cannot avail him.

As to the possession of the premises and the well. In the opinion of the Court, if the Sheriff put the prisoner in possession, even if his possession be joint with Griggs; still, Haynes would have as much right to go to the well or into that part of the house as he had been put into possession of, as Griggs had. He would, if he was in possession, have the right to break the lock without being considered a trespasser; and it would have been a trespass for Griggs to lock up the well to prevent Haynes from getting water at it. The property spoken of in the Statute as an habitation, means a dwelling, kitchen or buildings contiguous to the dwelling. A store-house, even if the owner do not live in it at the time; and even a well, if in the curtilage. You have no right to kill, in protecting any of these from a mere trespass, but you may to prevent a felony. If the well were locked by Griggs, it was a trespass only ; or if in Griggs' possession, and Haynes broke the lock, it was only a trespass in Haynes ; and in a trespass of this kind, in the defence of this kind of property, the party killing cannot le-

gally justify the killing.   It is for you to say, under the evidence, who had the possession of this well; and it is for you to say, whether this is a case of justifiable homicide; and if you find it justifiable homicide, you will acquit the prisoner entirely.   There is yet another kind of homicide; and if the evidence shows the prisoner guilty of that kind of homicide, then, it is your duty so to find him.   (Here the Court read that part of the Penal Code in relation to voluntary manslaughter and, involuntary manslaughter.)   I allude to manslaughter.   Manslaughter is the unlawful killing of a human creature without malice, express or implied, and without any mixture of deliberation whatever.   Which may be voluntary upon a sudden heat of passion, or involuntary, in the commission of an unlawful act or a lawful act, without due caution and circumspection.   Now is this a case of manslaughter, under this definition of that offence?   If so, is it voluntary or involuntary manslaughter?   Was there any actual assault on Haynes by Griggs?   Provocation by words, threats, menaces or contemptuous gestures, shall, in no case, be sufficient to free the person killing from the guilt and crime of murder.   Was there any assault or attempt to commit a felony by Griggs upon Haynes? (The Court read a definition of an assault in the Code.)   If there was, and there was not sufficient time to cool and for deliberation, between such provocation and the mortal blow given, and there was no malice, either express or implied, then you should find the prisoner guilty of manslaughter.   Was there a combat?   Was there any fight between prisoner and deceased? Who was the assailant?   Then what produced this killing? Was it on account of that sudden impulse of passion, supposed to be irresistible?   If so, then it was manslaughter only.   If there was time, between the provocation and homicide, sufficient for the voice of reason and humanity to be heard, then the killing should be attributed to deliberate revenge, and the killing will be murder.   If you believe that Haynes had malice before the killing, and had gone to the well to draw water, and that Griggs then made an assault upon him, so fierce as to induce Haynes to kill him under the influence of sudden pas-

sion, before he had time to reflect and cool, this is manslaughter *only*.

The license to practice law.   What effect that shall have on your minds, as evidence, is for you to say.   This instrument proves only the fact, that Haynes was admitted to practice law, and it does not prove any other fact.   If the prisoner relies on this license to prove his good moral character at the time of the killing, the license will not do so.   Good moral character, at that time, must be shown in another way by witnesses.   As to Griggs' character, Haynes can't justify under Griggs' violent, overbearing or dangerous character alone, but you may look into that character of Griggs', to ascertain the motives under which Haynes acted, and to satisfy your minds on the ground of fear and apprehended danger from Griggs. To avail Haynes of Griggs' character, it must appear that Haynes was acquainted with Griggs' character for violence, &c.   Look into this to see if Haynes was or was not reasonably actuated by fear.   (Here the Court took up one written request to charge; and reading over the first ground, he said: The Court has already read you the Code upon the subject of drunkenness, and will read it again.)

"Drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness was occasioned by the fraud, artifice or contrivance of other person or persons, for the purpose of having a crime perpetrated, and then the person or persons so causing said drunkenness, for such malignant purpose, shall be considered principal, and suffer the same punishment as would have been inflicted on the person or persons committing the offence, if he, she or they had been possessed of sound reason and discretion."   If a party kill another under the influence of voluntary drunkenness, it is the same as if he kill another when he is sober.

As to the 2d request: The Court gave the 2d request in charge, as requested, and stated also, that a threat which he would not have made, in his cooler moments, or made under excitement of any kind—this is entitled to very little weight.

But if he were excited by a spirit of revenge or malice against Griggs, that may be regarded with much greater weight in considering the question of malice. (Here the Court read the 3d request, and said this doctrine I think, is correct, if there was such a phrenzy as to make the prisoner unaccountable; but in this case the Court refuses to give this ground in charge, to its full extent.) (Here the Court read the 4th request, and said, if he made threats while he was drunk, they were not entitled as if made sober.) Fifth request. The Court charged as requested in that ground. Sixth request. The Court said this is true, as to the force : but if Griggs was a trespasser and Haynes took his life, he cannot justify, even if it was *his own* property. He ought to have retreated before the mortal blow was given, in order to justify the killing, if he could have done so without danger to his life or person. This may be taken into consideration to show whether there was malice or not. (Here the Court read the 7th request and said, the Court will not so charge, but the Court charges, if Griggs only intended to commit a trespass, prisoner had no right to kill; but he ought to have retreated, if he could have done so without injury to his life or person ; and if the prisoner retreated and was pursued by Griggs, and you believe from the evidence, that Haynes, so retreating, to save his own life, or to prevent Griggs from inflicting on his person some grievous bodily harm—under such circumstances, he can justify the killing. As to doubts, you must be *fully* satisfied that the prisoner's guilt has been *fully* made out by the evidence ; and it is the business of the State to make out this proof fully. No preponderation of evidence is sufficient, unless, to your satisfaction, the guilt of the accused, is beyond reasonable doubt. If the evidence satisfies you as reasonable men, beyond reasonable doubt, that is sufficient. You are not to look for mathematical certainty, as 2 and 2 make 4. You have taken an oath, that you have no prejudice or bias resting on your minds, either for or against the prisoner at the bar ; that you are impartial ; look well into the evidence as delivered from the stand, and to the law; and if you believe the prisoner is guilty of any crime, say so ; and

say what crime that is; and if you believe him guilty of no crime, render a verdict of not guilty.

Here the Counsel reminded the Court, that he had not charged as requested in the argument, to wit: that if Griggs, at the time of the killing was rushing on the prisoner with a weapon likely to produce death, and thus excited the reasonable fears of Haynes thereby, so that he feared that if he did not kill Griggs that the said Griggs would kill the said Haynes, or inflict upon him a serious and grievous bodily harm; and if Haynes shot Griggs really under the influence of fear, and to prevent this felony, then Haynes is justifiable. And the Court here charged the Jury, if Griggs was using a weapon likely to produce death, and was in striking distance of Haynes, at the time the fatal blow was given, or if Haynes was, by this weapon, put in fear of his life or serious bodily harm, and really acted under such fear, he is justifiable.

The Jury returned the following verdict:

We, the Jury, find the prisoner, Dennis E. Haynes, guilty of murder, and recommend him to mercy.

The prisoner, by his Counsel, B. H. Overby and A. W. Hammond & Son, moved to arrest the judgment on the following grounds: Because—1st. It is apparent, on the face of the indictment, that the allegations in the bill of indictment are contradictory and repugnant; and therefore, contrary to law.

2d. Said indictment charges two distinct offences, of different grades, against three different persons, in the same bill of indictment, and in the same count, which is bad.

3d. Three distinct offences cannot be legally joined by the same indictment, of different grades, against different persons; and therefore, this indictment is bad, and a good ground in arrest of judgment.

The Court, after hearing argument, over-ruled this motion.

The prisoner, by his Counsel aforesaid, then moved for a new trial on the following grounds:

1st. That the finding of the Jury is contrary to law and the evidence given on the trial of said case.

2d. That the verdict was contrary to the charge of the Court.

3d. After the Jury was charged with the case and had heard a portion of the testimony given in the case, said Jury separated, by Robert W. Fleming, one of the Jurors impannelled to try said cause, having left his fellow-Jurors and gone to his own house, where he remained about two hours, without the consent of the prisoner or either of his Counsel—it being made to appear to the Court that he had a very sick child at his house in the city—and the Court permitted such Juror to go home to see said child, where he remained about two hours, under charge of a Bailiff, appointed by the Court for that purpose.

4th. It was error in the Court to appoint, as a trior of the Jury, Henry D. Beman, who was not at the time entitled to a vote in the County of Fulton for the members of the Legislature in this State, there being no objection to said Beman by the prisoner or his Counsel at the time.

5th. That the Court erred in permitting the first Juror and the second Juror sworn, to be put upon the prisoner, without being sworn upon his *voir dire*, or without being asked whether they had any conscientious scruples as to capital punishment.

6th. That the Juror, Jesse Jenkins, after he was sworn to try the prisoner as a Juror, held a conversation with one Bazaleel Langston, without the Court's or prisoner's consent, before the Jury was impannelled. (Addenda.) On swearing said Langston, he stated that Jesse Jenkins, a Juror, after he had been before the triors, came back to where he was sitting before he went before the triors, and voluntarily commenced a conversation with said Langston, and asked said Langston if he thought he would get home that night? and the said Langston told the said Jenkins that he thought not; that he thought he was good for the week, or words to that effect. And the said Juror further said if I had not made the remark, that if the triors were not satisfied, that he would satisfy if he had to pull off his shirt, Overby would not have taken him.

7th. That one of the Jurors, William McWilliams, after he was sworn to try the said cause, held conversation with Levi W. Harville, without the consent of the prisoner or Court. (Addenda.) Mr. Harville, sworn, says: "That after McWil-

liams, the second Juror, one of the triors, came back into the Court room and said a Juror who had been put on the triors was so badly scared he could not talk; and not hearing what said McWilliams said, said McWilliams repeated it; and that that is all the conversation he recollects.

8th. That a Juror, Tho's H. Williams, was put upon the prisoner without any preliminary questions being asked by the Solicitor General and accepted by the prisoner; and after that, the Court, on its own motion, discharged the Juror, contrary to the express wish of the prisoner, it being shown to the Court under oath of Juror, that he was under 21 years of age.

9th. It was error in the Court to discharge J. W. Cason, one of the tales Jurors, upon his own motion, without consent of the prisoner. (Addenda.) The said Cason, on his oath, saying that his wife was sick and required his personal attention, at that time, at home, on that account. The Court erred in not arresting the judgment upon the verdict for the grounds stated in the motion to arrest.

10th. It was error in the Court to charge the Jury, that the license of the prisoner as an attorney at law, was evidence of nothing but his being an attorney at law; and that they could not regard this as evidence of his peaceable character, at the time of the killing.

11th. Prisoner's Counsel asked the Court to charge the Jury, if they believed from the evidence, the defendant was in the rightful possession of the well and appurtenances, at the time of the homicide, that he was not bound to retreat from any attack of deceased, but could justifiably oppose force to force"; and that the Statute gave defendant the right to defend his person and property against any one who manifestly intends to commit a felony on either. The Court refused to give this charge, but charged the Jury, that the defendant was bound to retreat if he could, without danger to himself, before the mortal blow was given; and that the property mentioned in the Statute had reference only to the habitation of the prisoner—smoke-house, kitchen or such property, on which a felony could be committed; or if prisoner had a store, even if he did

not live at it; and that any thing that took place at the house or well previous to the evening of the killing, was only to be taken into the consideration for the purpose of ascertaining malice on the part of the prisoner ; which charge and refusal to charge, the Counsel for the prisoner says was error in the Court; that the well might be within the curtilage, and then might be the subject of a felony.

12th. The Court erred in refusing to charge the Jury according to the written request furnished to the Court, before he commenced his charge by prisoner's Counsel.

13th. The Court erred in charging on every ground of the written request handed him by the Counsel of the prisoner, before he commenced his charge, in not charging as requested, and especially as to the fifth ground; because the Court, as to that ground, merely observed that he had already charged this, without reading the request handed him, to the Jury.

14th. Counsel for prisoner moved the Court to grant a new trial on this ground, because the verdict of the Jury was decidedly and strongly against the weight of evidence given in the cause.

15th. The Court erred in compelling the Counsel for the prisoner to announce, before the verdict was received by the Solicitor General (after the Jury was called by the Clerk and said they had agreed upon a verdict), or read by the Jury to the Court, whether prisoner desired to poll the Jury, although prisoner's Counsel insisted before the Court that the verdict should be first read. And the Court, on request of prisoner, polled the Jury before verdict was read, under the practice of the Courts in such cases. The Court gave, then, the privilege to the prisoner to poll the Jury after the verdict had been read, which he declined.

16th. That in polling the Jury, the Court erred in asking of each several Juror, as called up, before the verdict was read to him in open Court, " is that your verdict?"

17th. It was error in the Court to charge the Jury on the subject of threats. When one threatens to take away the life of another, recently, before the killing, is evidence of express

malice, and the Court having so charged, Counsel for the prisoner say it was error.

18th. The Court erred in its illustration of implied malice, as applied to the case before the Court on trial.

19th. It was error in the Court to charge—"if the prisoner could have retreated and did not, in the opinion of the Court this is not justifiable." And the Court having so charged, the prisoner says it was error.

20th. Prisoner introduced George Blackstock, who swore he saw Griggs between sun down and dark on the evening of killing, throwing rocks and chunks from the road over the palings into his lot; had his coat off, his sleeves rolled up, bare-headed, appeared to be angry; was swearing and was alone.

On motion of Solicitor General the Court ruled out this testimony.

After hearing argument, the Court over-ruled the motion for a new trial.

To all of which decisions and rulings of the Court, prisoner, by his Counsel, excepted and now assign the same as error.

OVERBY; HAMMOND & SON, for plaintiff in error.

Sol. Gen. BLECKLEY, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

Counsel for the prisoner having relied on six grounds only for a reversal of the judgment in the Court below, the rest being waived in the argument, the decision will be restricted to the first five—this Court declining to express any opinion as to the weight of the evidence.

Ought the testimony of George W. Blackstock to have been rejected ? He swore that between sun down and dark, preceding the night on which Griggs was killed, he saw deceased throwing stones and chunks from the road, over into the yard of his lot; that he was alone, with his coat off and his shirt

sleeves rolled up; and that he was cursing and appeared to be· in an angry mood.

It will be borne in mind that the controversy in this case is,. not whether Haynes killed Griggs. As to that, there is no dispute. But the question, and the only one is, did he do it under· such circumstances as will mitigate the offence to manslaughter, or even make it justifiable homicide in self-defence? And in order to arrive at a correct conclusion upon this point, it is important to ascertain the temper and conduct of the parties, to determine who was most likely to have brought about the emergency which resulted in the death of one of the combatants.. The proof shows that Mrs. Haynes, the wife of the accused, had been driven away from the premises the same afternoon, with threats of violence to her husband, should he venture to draw water out of the well. It also appears, from the testimony of George A. Lofton, that when Haynes went over the night of the killing, to get water, that Griggs threw stones at him; whether the same that he had previously prepared, is left uncertain; and was, we think, a fact very properly to have been submitted to the Jury. We are clear that Blackstock's testimony should have been received.

[1.] The next complaint is, that the charge of the Court, as to the impeachment of the witnesses, was too vague and indefi-· nite. The substance of the instructions upon this head was, that unless the testimony of the Griggs family—mother and children—was *corroborated,* the Jury might repudiate it entirely. Otherwise, they might believe it or not, as they should: see fit. We ask, how *corroborated?* A great many facts were testified to, many of them wholly immaterial. Suppose them to have been corroborated in a single immaterial fact, would that restore their credit *in toto?* We would earnestly, though most respectfully, recommend the practice of generalizing less and particularizing more, in applying legal principles.. The credit of impeached witnesses is restored certainly to a much greater extent, when corroborated as to the *main* than. the immaterial facts of the case. Besides, much depends again: upon the *extent* as well as the *nature* of the corroboration..

Suppose five facts constitute the proof in the case, and the impeached witnesses are sustained as to *four*, would not their credit be much more effectually restored than if corroborated as to *one* only? Were, for example, the widow, her son and daughter, whose character for truth and veracity was impeached by a dozen or more witnesses, *corroborated* upon *every* point, except as to the killing, would we not the more readily and reliably believe them as to that also?

I trust that my brethren of the bench will excuse this suggestion. I give it as the result of thirty-four years' experience, that ordinarily, *general charges*, however abstractly true, are worse than useless—their effect being to misguide, instead of directing the Jury to a right finding; and the only instructions which are worth any thing, are such as enable the Jury to apply the law to the *precise case* made by the proof. If the case comes within an exception or limitation of a general rule, restrict the investigation until the exact point upon which it turns stands out prominently before the eye of the Jury, stripped of all generalities. Their task is then comparatively easy and safe.

[2.] [3.] Was the Court right as to the doctrine of *retreat*, as applicable to this case? If Haynes was entitled to the joint use and occupation of the well, and he went there to draw water for his family, was he bound to retreat therefrom, because violently assaulted by Griggs? And does his justification depend upon that? Must one retreat from his house or his family, and leave the former to the occupancy and the latter to the tender mercies of the aggressor? Such is not our understanding of the rights of a citizen. In the opinion of this Court, instead of charging the Jury that Haynes was bound to retreat as far as he could in safety, we think they should have been instructed " to inquire, first, as to the right of Haynes to the enjoyment of the well, in common with Griggs. And if so, did the prisoner go there to procure water for his family, or was this a mere pretext; and did he seek the contest for the purpose of killing the deceased? If they found the latter to be true, Haynes was guilty of *murder!* Again: Did he mere-

ly go to the well to get water, and in the heat of passion slay the deceased, in consequence of the sudden and violent assault made upon him, it not being necessary for him to do so in order to save his own life or protect himself from great bodily harm? If they should find these to be facts, then Haynes is guilty of *manslaughter*. But there is still another question. Did the prisoner shoot in defence of his life? Was it necessary to save his own life—*not his property in the well*—from such a serious assault as would create a reasonable apprehension that his own life was in imminent peril? If so, and he shot to avert the threatened danger, he will be justified.

[4.] It has been well said and settled, however, that before the law of *necessity* can exist, a case of *necessity* must exist.

[5.] The slayer, himself, must be faultless; he must owe no duty to the deceased; be under no obligation of law to make his own safety a *secondary* object; otherwise, he is answerable to the law of the land, without any immunity under the shield of necessity.

[6.] Should the testimony as to the violent altercation between the parties, on a day previous to the killing, have been restricted as it was by the Court, to the simple purpose of showing malice in Haynes? We think not. Why limit the testimony to this object? Did it not serve, in some degree, as a key to the motives and conduct of the parties in the final interview, which terminated so fatally? This Court stands pledged by its past history, for the abolition, to the extent of its power, of all *exclusionary* rules, which shut out facts from the Jury which may serve, directly or remotely, to reflect light upon the transaction upon which they are called upon to pass. For one case gained by improper proof, ninety-nine have been lost or improperly found, on account of the parties being precluded, by artificial rules, from submitting *all* the facts to the tribunal to which is committed the decision of the cause. *Verdicts*, notwithstanding their etymological meaning, (*vere dico*) will never speak the truth, because Juries can never measure the power and influence of motives upon the actions of men, until the door is thrown wide open to all facts calculated to

assist, in the slightest manner, in arriving at a correct conclusion in the pending controversy.

Complaint is made, that the professional license of Haynes was allowed to be read, for the purpose only of showing that he had been admitted to plead and practice law as an Attorney.  We see no error in this.  If the object was to raise the presumption of the good character of the defendant, it was inadmissible for that purpose, if for no other reason, because his commission bore date long prior to the killing.  It is contended, however, that it served to explain what is construed into a threat by the prisoner, namely: that he would take the law into his own hands—meaning, thereby, as it is insisted, that he intended to manage his own case, in re-occupying the premises in dispute, and from which he had been ejected by Griggs.

We are unable to perceive why the license should not have been legitimately used for the latter purpose, under the decision of the Court; and we apprehend it was so used.  At any rate, we see nothing in the record to contradict this idea.