## Price *vs.* The State of Georgia.

1. Where a husband and wife had separated, the wife returning to her father, and the husband was killed by the father while the former was approaching the house of the latter at night, in company with another, it was admissible to show that the husband obtained his companion to accompany him, and stated to such comrade that he had good news from his wife, and wished to meet her and see the defendant and family, with a view of taking her back to his own home, and that his adventure was peaceful, and he meant no harm, having received a letter from his wife to meet her. Such statements were part of the *res gestæ.*

2. The difficulty between the defendant and deceased having arisen out of the domestic troubles of the deceased and his wife, and the latter having left his house for that of her father (the defendant) riding horseback behind another man, it was admissible to show that this man was seen in a private and hidden place about a hundred and fifty yards from her father's house, taking improper liberties with her.

3. That the preliminary examination of a physician as to the pysical condition of the deceased, to show whether or not the latter was *in articulo mortis*, made with a view to ascertain whether dying declarations were admissible, was conducted in the presence of the jury, was no ground for a new trial, where none of the declarations themselves were elicited, and none were stated.

4. Attacks on the character of a witness by showing contradictory statements may be rebutted by proof of general good character for truth and standing in society.

5. Where the question before the jury involved an attack on the person as well as on the habitation or property of the accused, it was the duty of the court to charge the law touching the defence of person and of habitation, and in regard to the kind of homicide, whether murder, manslaughter or justifiable homicide, and when the law, in respect to each phase which the facts in the case warrant, is fully and clearly explained in the charge it is no ground for a new trial.

6. The charge was full, clear and explicit, and fairly presented the defences to which the defendant was entitled.

7. If the deceased was a mere trespasser, with no evil intent, he was entitled to be warned off; and then if he did not leave, that degree of force necessary to make him leave could be used. Such, in substance, was the charge.

8. Where jurors are attacked, they may repel the attack by counter-affidavits.

9. The verdict was not contrary to law or evidence . .

May 13, 1884.

Criminal Law. Evidence. *Res Gestæ.* Practice in Superior Court. New Trial. Impeachment. Before Judge CARSWELL. Johnson Superior Court. September Term, 1883

Warren Price was indicted for the murder of Romanus F. Perry, alleged to have been committed on August 27, 1882. The evidence for the state was, in brief, as follows: Perry was the son-in-law of Price. After a brief married life, lasting only a few months, Perry's wife left him, and returned to her father's house, which was several miles distant from that of her husband. She went thither riding on horseback behind one Mandel Powell, who was the disturbing element between the husband and wife. After this, she was seen with Powell in a sunken place, which the witnesses termed a pond, not very far from the house of her father, and he was seen embracing her. The witness who testified to the transaction did not see any other impropriety; but a warrant was sued out against Powell by Perry for fornication and adultery. Some two or three weeks thereafter, Perry asked one or two of his neighbors to go with him to Price's house. He told one Willoughby that he had good news from his wife, and asked him to go. The latter being unable to do so, Perry turned to one Tharp, who was standing by, and asked him to go, saying that he had good news, and wanted to see his wife, and wanted to talk with her and her father and mother; also that he wanted his wife to come home with him. He also

said that he wanted some one along; that he did not want any fuss. Tharp consented to go, and they started before sundown, but were detained by a shower, and reached the vicinity of Price's house between eight and nine o'clock. They strayed somewhat from the way, although Perry had been there several times. They approached the house a hundred yards, or thereabouts, from the gate, by a trail or old path, and, reaching the enclosure around the farm, got over it, and went towards the house, between a corn and cane patch. As they entered the enclosure, a dog began to bark. Tharp said he did not reckon the dog would come down there. Perry replied, no; that they walked a little light until they got near enough to hail; that he expected his wife every minute, and wanted to see if Mandel Powell was there. They proceeded on tiptoe, and arrived within twenty-five or thirty yards of the house, walking along the edge of the cane patch, when Price fired upon Perry with a single-barrelled shot-gun, loaded with shot and a bullet. Perry fell to the ground, and Price said, "I reckon I have got him now," this remark being made to his family, who came out after the shot. Some shot from Price's gun also wounded Tharp, but he was not conscious of it at the moment. He stooped over Perry, who murmured something about "kill." Tharp looked up, saw Price with his gun, and, thinking he would next be shot, ran away, and subsequently discovered that he also was wounded. He then went to the house of Perry's mother, and, in order not to frighten her, told her that he thought Perry had shot him accidentally. Powell was at the house of Price on the night of the homicide, and was made a witness for the state. (The name of this witness is, in the record, "Manson Powell," at the head of his testimony.) He testified that he was in bed when the shot was fired, but arose, put on his pantaloons, and went out on the piazza, where he found Price, his daughter, and the balance of the family; that he heard Price say, "Oh, yes, I reckon I have got you now;" that he went out to where

Perry's body was lying, and found him lying on his right side; that there was a pistol lying on his coat-tail, outside of his pocket. Tharp testified that, shortly before reaching the fence, Perry pulled a pistol out of his pocket, and said, "Mr. Tharp, I have got my pistol; I don't mean any harm by it;" and then put it back in his pocket, that the witness saw no more of it, and that Perry did not have it out at the time of the killing. After showing the pistol, he offered Tharp a drink of whiskey from a flask which he had.

One Weeks, a witness for the state, testified that before the day of the killing, Price's little child had a bullet rolling it about ; that Price took it from the child, saying that he did not have any large shot; that "there is somebody creeping around my house of a night, and I will creep into them." Price asked Weeks if that would kill anybody. Weeks inquired who he wanted to kill, and Price replied, "Perry," and told Weeks to tell Perry not to come there any more ; and this message was communicated to Perry. The same witness testified that, during the day of the homicide, Perry was at his house and said, "he was going up ahead to see his sweetheart," and when asked whom he meant by his sweetheart, replied, "You know." He also slapped his pocket, and said that he had good news in it. This occurred about sundown. Another witness testified that she thought she saw Perry go to his satchel before leaving home on the Sunday evening before he was shot, and that subsequently she found in this satchel a note, which was put in evidence. It was unsigned, but read as follows :

"Mr. Perry :—I seat myself to drop you a few lines to let you know that I want to see you. I want you to come just as soon as you can come, and carry me home, if you please. If you do, go by the house and take the right-hand at the end of the lane till you go across the branch. When you cross the branch, then stop till I come. I will be there."

Another witness testified to conversations with Price after the shooting, in which he said, in substance, that, on

the night of the homicide he lay down on his bed; that he seemed to be restless; got up, lit his pipe, and, going out on the piazza, sat down near his door in a chair; that, after sitting there some little time, he looked around and discovered some person near his house; that he reached up, got his gun, and shot him. The witness who testified to this stated that he asked Price if he was expecting Perry there on the night of the homicide, and he replied that he was expecting him at any time. Defendant also said that he had heard threats made against him. Experts testified that, from the nature of the wounds inflicted on Perry, he could not have had his arm extended at the time of the shooting, but must have been in a slightly stooping posture.

The evidence for the defendant was, in brief, as follows: After Mrs. Perry left her husband and returned to her father's house, Perry published in a newspaper a card, charging that his wife had eloped with Mandel Powell, and had gone to the house of her father; that she and Powell were on terms of improper intimacy, and that her father and mother were cognizant of the fact, and were abetting her in her conduct; that, on discovering her absence, he had attempted to see her at her father's, but Price had told him to leave—no one wished to see him; that he had treated her kindly, and had given her no cause for this conduct. This card was dated July 11. On August 3, Perry went into a field, where two nephews of Price were working, for the purpose of seeing one of them, and while there, he threatened that, whenever he caught Price, he would whip him, expressing his intention in very vulgar and indecent terms. These threats were subsequently communicated to Price. Price stated to his brother, who was a witness for the defence, that, on August 16, Perry rode along the outside of his fence and fired five times with a pistol as he rode. He told the witness to go and tell Perry to stay away from his place, for if he caught Perry slipping around his house at night, he would shoot him. This was communicated to Perry

about August 5, and Perry admitted that he rode along the side of the fence and fired off his pistol. Perry asked this witness what he thought of the newspaper article, and read it to him. The witness asked Perry why he did not warn Price not to keep his wife there any longer, to which Perry replied that he was afraid that Price would throw her back on his hands, and that he would never live with her another day. In a conversation between another witness and Price, the latter also stated to the former that he could not stay in his house in peace; that he never went into the house expecting to see the sun rise the next morning; that he did not expect to live there another month; that he expected to be killed in that house whenever he went in at night; that he barred the doors, and tied up his dog to the door to guard it; that, if he had his crop so that h could leave it, he would not stay there another day, but would leave at once. He also detailed to this witness the conduct of Perry as to firing off his pistol, etc.

A witness for the defence, who was present at the conversation at the jail, in which Price detailed the facts of the shooting, stated that Price said that he had retired, but being restless, he could not sleep; that he got up and lit his pipe, and after sitting some time, he discovered two parties standing in his yard, between the cane patch and his house; that he got up, stepped to the door, took down his gun, and immediately shot them; that he thought the party was trying to shoot him; that one of the persons he saw seemed to have his arm extended; that he (Price) was laboring under great fear; that he had reason to expect that he was going to be mobbed from what he had heard; that his life was in danger; that he was expecting them at any time, but especially that night; that he thought it was Perry, and that the latter had his arm extended, as if to shoot; that in getting his gun, he knocked down a chair, and the party stepped back into the cane patch. Another witness for the defendant testified substantially to the same conversation with Price, and also added that he asked

Price why he was expecting Perry that night, and he said, because there had been some threats made ; Price further said he could not go to sleep, because he was frightened ; and that he shot because he saw two people, and the arm up, as if they were going to shoot him. One witness for the defendant testified that he had been shown a note of similar purport to that introduced by the state, by Perry, before his marriage, and the latter said it was written by one Amanda Whitfield. Amanda Whitfield, or Powell, as she was sometimes called, testified that she wrote the note to Perry before his marriage; that she was at a house near Price's, and desired to be carried to her mother's, and therefore wrote to Perry to come for her ; that she did not sign any name because she did not think it necessary ; that she gave it to his brother, and told him to tell Perry ; that she had been married, but was not then living with her husband.

The defendant made a statement, in brief, as follows : About the second of July, Perry remarked to his wife that if he ever hit her, he would hit hard enough to kill her. On July 7, she returned to her father's house, and said she had come to stay; that her husband had been showing her places where he had been having improper intimacy with different women, and she was disgusted. On the same day, Perry went to the house of defendant, and asked if his wife was there. He said he wanted defendant to be certain to keep her there. Defendant told him to leave, and never put his foot on the place again. Defendant then detailed the firing of the pistol by Perry on August 16, and the circumstances of the killing, substantially as he had previously stated them to the witnesses for the defence, and as they narrated his statements on the stand. He also added, " I done it in self-defence, to protect my house and family, from the fact that I received a card that did lead me in the way to believe that my life and family would be destroyed. Gentlemen, I was afraid to stay there. If I had had my crop gathered, so I could have left, I would

have left there.   I was expecting day and night both to be done away with, me and my family too."

The jury found defendant guilty.   He moved for a new trial, on substantially the following grounds:

(1.) Because the court permitted Tharp, a witness for the state, to testify that " Perry asked me to go with him; said he wanted to see Jennie, his wife.   He said he had good news, and he wanted to see his wife, Jennie, and wanted to talk with her and the rest of the folks, Mr. Price and his wife's mother."   The objection was that this was irrelevant, hearsay and not communicated to defendant.

(2.) Because the court allowed Weeks, a witness for the state, to testify that Perry slapped his pocket and said, " I have got good news in my pocket."—Objected to as hearsay and irrelevant.

(3.) Because the court allowed this witness to testify that he saw Mrs. Perry riding behind Mandel Powell; that about two or three weeks afterwards, he saw them together again in a pond, late in the evening; that Powell laid his arm around her, and the witness turned off and went home —Objected to as irrelevant.

(4.) Because the court permitted the jury to remain in the box during the preliminary examination of Dr. Curry, a witness for the state, for the purpose of laying the foundation for proving dying declarations of deceased. [The court certifies in a note that, after hearing the preliminary examination as to the condition of deceased, he rejected the declarations, and they were not given in evidence.]

(5.) Because the court allowed the solicitor general to prove by a witness, Tarver, that the general character of another witness, Dr. Curry, was good, and that he would believe him on oath.—The objection was that there was no impeachment of the witness, Curry, by proof of bad character, and no impeachment at all, up to that time. [The court, in a note, states that counsel for defendant had proved contradictory statements made by the witness,

Curry, and on cross-examination, he allowed proof of his good character, to sustain him.]

(6.) Because the court charged as follows : " In order to reduce the crime from the grade of murder to manslaughter, at the time of the killing, was Perry attempting to commit a serious personal injury upon the person of Mr. Price ? Was he attempting to commit an injury upon his person ? Was he doing anything to justify the excitement of passion, and exclude all idea of malice on the part of Mr. Price, to justify him in killing Perry ? Was it provocation by words, by threats, by contemptuous gestures and menaces, and was that the only provocation given ? The law says, if that was the only provocation given to justify the killing, in no case shall the person killing be free from the guilt and crime of murder."

(7.) Because the court charged as follows: " From the time Mr. Perry made his appearance where Price could see him, was Mr. Price in such a position that it was necessary to kill Perry, in order to avoid personal injury being inflicted upon him ? If he was not in such a position as that it made it necessary for him to kill Perry, in order to protect himself from a violent assault or serious personal injury, then he was not justified in killing him, and the law, in that case, would term it murder."

(8.) Because the court charged as follows : " Look into all the surrounding circumstances, and see what Mr. Perry said, which has been introduced in evidence, before he started. there. Inquire and ascertain what were the motives and purposes that led him to go to Mr. Price's house that night. See what he was doing at the time the killing took place. Ascertain at what time the killing was done, and the purposes that carried him there, as discovered from the testimony, from his manner and from what he was doing at the time the killing took place, and see if the facts demonstrate that the killing was necessary, in order to prevent Mr. Perry from committing a felony on the person of Mr. Price, his habitation or property ; or was

v 72-30

he endeavoring, or manifestly intending to commit either of these offenses against Mr. Price, his property or habitation, and was the killing of Mr. Perry necessary at the time, in order to defeat him from carrying out that intention or endeavor. Was it necessary to do that—to kill him—in order to prevent him from carrying out his manifest purpose or intention of committing a felony? Of committing violence on his person, which would amount to a felony? Or an offense against his habitation or property, which would amount to a felony? If that was his intention, and he was manifestly endeavoring to do that at the time he was killed, that would justify him (Price) in killing him."

(9.) Because the court charged as follows: "Our statute goes on further, and says that a man is not justified in killing another from the bare fear that he is going to commit these offenses. A man must not kill another because he has a bare fear of danger. The danger must be imminent, and he must not act upon imaginary fears. He must act under the fears of a reasonable man that these offenses are about to be committed on him. If he was actuated by the fears of a reasonable man, that the man who was killed was about to commit a serious personal injury upon him or his property, the law don't require him to wait until these things are done; but if he was actuated by the reasonable fears of a courageous man, that either of these offenses was about to be committed on him, he is authorized to act under these fears, and kill his assailant. But they must be reasonable fears. A man must have some justification for such a fear. He must not act upon a bare imaginary fear—seeing a man coming up to his house who has no hostile intention to him at all, and just imagine that that man is about to commit a serious personal injury on him, or an injury on his habitation or property; and if he did so, he would not be justified in killing him."

(10.) Because the court charged as follows: "You

must examine into the case, and see whether the circumstances surrounding Mr. Price, at the time he shot Mr. Perry, were sufficient to excite the fears of a reasonable man. Did he act upon a bare imaginary fear, without sufficient justification? Did he act upon a bare imaginary fear, and shoot down an innocent man who was going to his house on a peaceful errand? If he did kill a man who was going there on a mission of peace, and who harbored no hostility to him or his habitation, he would be guilty of murder."

(11.) Because the court charged as follows: "If, on the contrary, from what had previously occurred between him and Mr. Perry, and from the surrounding circumstances at the time of the killing, you find they were sufficient to justify the fears of a reasonable man, that Mr. Perry was there to commit a serious personal injury upon him, his habitation or his property, and it was necessary to kill Mr. Perry, in order to prevent the consummation of these offenses, then it would not be a case of murder, but one of justifiable homicide."

(12.) Because the court charged as follows: "It is insisted that, in no view, was Mr. Price authorized to kill Mr. Perry without warning or remonstrance. Well, upon that subject I charge you this: A man has a right to prevent unpleasant people from coming to his house or premises. A man's premises are under the protection of the law, and persons who are disagreeable to him have no right to invade his premises, although their mission be not hostile. He has a right that he be relieved of such persons; and when a man gives another notice that he must not come upon his premises, that he will no longer tolerate his being there, and the person goes there, though not upon a hostile mission, he is what is termed in the law a trespasser upon the premises. If he goes there from motives of hostility against the person, or his habitation or his property, that party has a right to protect himself to the extent I have stated. But if the party who was notified not to

go there, does go there, even not with hostile intention, he is a trespasser, and the owner of that house and the premises, who has so notified him not to come there, has a right to eject him. He has a right to require him to leave his premises, and if the trespasser declines to do so, he is authorized to use whatever force is necessary to eject him. He is not justifiable in shooting him down simply because he is a trespasser. He must tell him to leave; that his presence there is objectionable; that he is not wanted there; and if the trespasser refuses to leave, he is authorized to use so much force as would be necessary to eject him from the premises."

(13.) Because the court charged as follows: " In con- clusion, let me say to you, that your position imposes very grave and responsible duties upon you. Upon the one hand, you have in your charge, I might say, the life of the prisoner and his destinies hereafter. On the other hand, you have in your charge the highest and greatest interests of the state in the enforcement of the law and the protec- tion of society. All the great interests involved in the enforcement of the law in this country are intrusted to your charge in this case."

(14) to (16.) Because of bias on the part of certain of the jurors. [In support of this ground, several affidavits were introduced to show remarks made by four of the jurors indicating prejudice against the defendant. A counter-showing was made, and the jurors denied making the statements attributed to them. Three of them made positive denials, and the fourth stated that he had no re- collection of any such conversation or statements, and that, if he made any remarks concerning defendant, they were not expressions of his opinion or bias, and that he had no bias, and assented to the verdict rendered solely from a sense of duty, under the law and evidence.]

The motion was overruled, and defendant excepted.

H. D. D. TWIGGS; HINES & ROGERS, for plaintiff in error.

C. ANDERSON, attorney. general; R. L. GAMBLE, solicitor general; A. F. DALEY; J. M. Stubbs, for the state.

JACKSON, Chief Justice.

Warren Price was found guilty of murder; moving for a new trial, it was denied him by the presiding judge; to that denial he excepted, and the case is here for review. The wife of deceased had left him and gone back to her father's house, riding on horseback behind a man who seems to have been intimate with her to an extent unbecoming wifely modesty. Price, the defendant, was that father, and the difficulty between father and husband arose out of alienation of good will on account of this domestic trouble, and eventuated in the homicide by the defendant, on the occasion of an effort by deceased to see his wife and take her home, in response to a letter from her, which he stated to the friend accompanying him he had received from her, and had in his pocket. He reached the farm of the defendant after night-fall, and approached the house by a route through an obscure path between a corn and cane patch, and was shot down by Price from the portico of the house, when some distance from it, but within gun-range, he and his friend approaching at the time, or stopping at the moment to survey the surroundings and take a reckoning of the position, a dog having barked at the moment. The questions of law made on the motion for a new trial will be reviewed and determined now by us, after having closely scanned the evidence fully reported by the reporter at the head of this opinion.

1. The deceased, after an effort to get one or two other persons to accompany him on his visit to Price's house, where his wife was, got a man by the name of Tharp, with whom he had lived, to accompany him, to whom he stated that he had good news from his wife, and he wished to meet her and see Price and the family, with the view of taking her back to his own home, and that his adventure

was peaceful, and he meant no harm, having received a letter from his wife to meet her. These statements were parts of the act of going, of the *res gestœ*, and were properly admitted. *Johnson vs. The State*, this term; 67 *Ga.*, 460.

2. The state proved that the man with whom the wife of deceased left his home for her father's, was seen in a dry pond, a private and hidden place, some hundred and fifty yards from her father's, taking improper liberties with her. Defendant assigns error also on the admission of this testimony.

Viewing this circumstance in connection with the nature of the trouble which was the exciting cause of the unfortunate and bloody catastrophe, of the wife's desire to return home with her husband, expressed to him, as he informed the witness in the very act of going to the scene where he fell; of the husband's right to condone any offense of the sort which she had committed, and receive her again as his wife, and of all the other circumstances of this transaction, from beginning to end, which cluster around the wife and daughter as the central figure in the drama, we see no trouble in sustaining the court in letting it go to the jury, as shedding light upon that scene, and showing motive in deceased to desire to rescue his wife from the continued efforts of her paramour to prostitute her further. This whole case would be as obscure in reaching the truth of motive and conduct in the parties to the tragedy, if the woman who caused it were left out of view,— if her character and conduct at her father's and around it with the man who took her there, were not exhibited to the jury, as the great epic of Homer, the Siege of Troy, would become, if Helen were stricken from its leaves. The evidence was relevant, and bore right on the bull's eye of the case.

3. It is again objected that the court permitted the doctor to be examined in presence of the jury, in respect to the condition of deceased,—whether or not he was *in ar-*

*ticulo mortis*, with a view to ascertain whether his dying declarations were admissible. Not a word of statement of the deceased, touching this transaction, was elicited. The jury heard nothing at all from the lips of the deceased about the killing, or what led to it, or had aught to do with it. That point was not reached, but after examining the doctor on his condition, whatever statement the deceased had made perished with him, and was heard by nobody in court. Yet the objection is made on the authority of *Hall vs. The State*, 65 *Ga.*, 36, that a new trial ought to be granted, because the doctor's preliminary examination, which elicited nothing touching the merits of the case, was heard by the jury. To what extent is that case to be carried? Certainly nobody will insist that it covers the point here. For my own views respecting its true limits,' as designed by the then court, of which I was a member, and as intended to be limited by Judge Crawford, see my dissenting opinion in *McDonald vs. The State*, last term. Besides, this case is one of dying declarations, not confessions of the accused. See 17 *Ga.*, 465, 6th head-note and p. 484.

4. The Code, as well as repeated rulings of this court, affirms that attacks on the character of a witness by contradictory statements may be rebutted by proof of general good character for truth and standing in society. Code, §3575.

5. Where the questions before the jury involved an attack on the person as well as on the habitation or property of the accused, it was the duty of the court to give the jury the law touching defence of person and of habitation, and in regard to the kind of homicide, whether murder, manslaughter or justifiable homicide; and when the law, in respect to each phase which the facts make in the case, is fully and clearly explained in the charge, of course it is no ground of error on which a motion for a new trial can successfully rest.

6. The charge of the court, in this case, is full and clear.

It fairly presents the several defences to which the accused was entitled. It is explicit, to the effect that, if from all the circumstances which had surrounded the accused and deceased from the inception of this difficulty to its bloody consummation, the defendant was actuated by the fears of a reasonable man, that deceased "was there to commit a serious personal injury upon him, his habitation or his property, and it was necessary to kill Perry in order to prevent the consummation of these offenses, then it would not be a case of murder, but one of justifiable homicide," and in addition, it calls the attention of the jury to section 4334 of the Code, which declares that "all other instances which stand upon the same footing of reason and justice as those enumerated, shall be justifiable homicide," and charges "that they are left to the enlightened conscience and reason of the jury;" and then it emphasizes this section, repeating its language, and tells the jury that defendant's counsel "invoke it as covering his case," and repeats, "that is a matter which rests entirely with your enlightened consciences and reason. You have heard the law of manslaughter and justifiable homicide, and if, after a calm, impartial and rigid investigation of all the testimony in the case, you find, under your consciences, that Mr. Price was justifiable, outside of the law of homicide, as given to you, and you think it is a case that stands upon the same footing of reason and justice as a clear case of justifiable homicide, then you are authorized to acquit him." Add to the above a distinct charge of the presumption of innocence, and the degree of evidence beyond a reasonable doubt as necessary to convict, which immediately follows, and the conclusion is irresistible that the presiding judge held the scales of justice in a merciful hand.

7. If the deceased was a mere trespasser, with no evil intent before and at the time he was shot down, he was entitled to be warned off, and then, if he did not leave, that degree of force necessary to make him leave may be used. This, in substance, is the charge of the court on this point,

and we think it the law. 17 *Ga.*, 465; 58 *Ib.*, 35; Russell on Crimes, 519

8. Surely, it needs no authority to show tha: when jurors are attacked, they may repel the attack by counter-affidavits. See Georgia Reports *passim.* This attack was fully and successfully repelled and overcome in this case.

9. The verdict is not contrary to law or evidence. If the deceased was not decoyed to that house that night for the purpose of killing him, it is quite certain that a delib erate purpose to kill him, whenever he came there, dwelt in the heart of the accused. The gun was loaded for that purpose; the very ball which alone would have done the work, was taken from a child playing with it, and put in the shot-gun, with that intent; the other shot in the gun would have done the work, and according to the doctor, the wounds they made were equally fatal; the exclamation of accused, " Ah, I have got you at last," as he saw, in the clear moonlight, the young man fall, is as clear evidence of purpose long meditated as the large ball that he took from the child, and to make the killing sure, rammed in the gun with the smaller shot, and showed that to wound, to frighten off, to repel an intruder, were not enough to sat-isfy the accused, but sure work, the work of death, was in his heart. He expected him. To some witnesses he said every night, to another, especially that night he said he expected him. Why especially that night? Was the decoy duck his contrivance? Was the " good news " the poor fellow said he got from his wife sent within his knowl-edge, and therefore did he expect, and was he on the look-out for him? These are questions which, under the facts proved, the jury may have answered in the affirmative; and if that be the truth, the murder has no extenuation. Or, it may be, that the words, " especially that night," can be explained on some other hypothesis; if so, then was he in danger as to personal hurt? Did deceased have his pistol out or pointed? It is clear that he did not. Was there danger to his habitation? Another man was in the

house with him, and surely the two could have protected it, if attacked; but no attack was made upon it.

So that, at best for defendant, he shot, and shot to kill, and did kill, without a single word of remonstrance cr caution, or warning, when it is not shown that his person or habitation was endangered at the time. And his eye was so keen and his nerves so steady that moonlight was as good as daylight would have been, to execute his purpose. The man against whom revenge was in his heart was killed, and the other accompanying him was wounded, and he left the body of his friend in the hands of the slayer and his family and of the friend lodging that night in the slayer's house. How easy to take the pistol of deceased out of the pocket and put it by him? How easy to take out of his pocket the note of his wife which decoyed him to his death? Be all this as it may, in the eye of Him whose all-seeing eye is over every scene, certain it is that this court has no power, in law, to adjudge either that the jury did wrong in finding defendant guilty, or that the judge did wrong in upholding the verdict.

Judgment affirmed.