## STROZIER vs. CARROLL.

1. The rule of Law is, that the credibility of a witness is a matter to be determined by the Jury.

2. There being but one witness to a material point in a case, and he standing self-contradicted before the Jury, a new trial will not be granted, because the Jury found against his evidence.

Assumpsit, in Thomas Superior Court. Tried before Judge HARRIS, at the June Term, 1860.

This was an action brought to recover damages for the alleged breach of a warranty, that a certain slave, sold by the defendant to the plaintiff, was "sound and healthy."

The following testimony was adduced upon the trial of the case in the Court below, to wit:

ISAAC JOHNSON, in answer to interrogatories exhibited by the plaintiff, testified as follows: I was present at the house of the plaintiff, on the 28th of February, 1857, when the defendant sold to the plaintiff a negro girl by the name of Silvia, whom I judged to be fourteen or fifteen years old; the girl was valued, by defendant, at nine hundred dollars, and the plaintiff, in the trade, let the defendant have a negro man valued at one thousand dollars, and the defendant was to pay him one hundred dollars to boot; the girl was hoarse, had a bad cough, and complained of a pain in her side; the defendant represented her as sound, and said that she had got wet, and had taken a bad cold; I understood, from the conversation, that the plaintiff was trading for the girl for the benefit of James Scarboro, and that bills of sale were not to be passed until it was ascertained whether or not Scarboro was pleased with the girl; the defendant said he would be there again in two or three weeks, at which time written bills of sale were to be executed; I was the plaintiff's overseer at the time of the trade; in two or three days after the trade, the girl was sent to the field to work, and plowed about one-half hour, and complained so much of a pain in her side, that I set her to picking up trash; finding that she could not do that, I sent her to the house and she was not able to work in the plantation afterwards; the girl was not well at any time during her stay at the plaintiff's; she com-

CREDIBILITY OF WITNESSES—JURY SOLE JUDGES OF. "The jury are the exclusive and sole judges of the credibility of all witnesses. Merchants Bank v. Trustees, 62 Ga. 271; Walker v. State, 72 Ga. 200; White v. Hammond, 79 Ga. 182; Cleghorn v. Janes, 68 Ga. 87. Therefore, when the credibility of a witness is attacked as by an effort to impeach him in any of the methods pointed out by law, the jury then became the triors of the witness sought to be impeached, and of the witness or witnesses by whose testimony the attack is made; they are to weigh

plained, was unable to work, and died in about one month after the trade; Drs. Bledsoe and Twitty were called in by the plaintiff to see the girl whilst she was sick; pending the trade, and both before and after it was confirmed, the defendant represented and warranted the girl to be sound, and with the understanding that the girl was warranted to be sound when the trade was confirmed; the girl was worth nothing; if she had been sound, as the defendant represented her to be, she would have been worth nine hundred dollars; I was well acquainted with the negro girl, being at the time the plaintiff's overseer; I now live with J. R. Scurry.

The same witness, in answer to interrogatories exhibited by defendant, testified as follows:

That he was at the house of plaintiff in March, 1857, he thinks, and the measles prevailed at the time amongst plaintiff's negroes; that he was not present when the trade was made for Silvia, but the defendant said she was a sound negro; he does not know what was said about another negro, but the other negro was sold as a sound negro; defendant had two negroes with him; Silvia took the measles after plaintiff bought her; she died; she was kept in Mrs. Strozier's room, and treated well all the while; she had a cough when she first came there, which continued with her until she died; she got up with the measles so she could get about; he does not know positively of what she died; it might have been measles, and it might have been something else; the trade was made the 27th of March or February, he does not recollect which, and the girl was taken sick the fifth day after she came there; she was unwell when she came, but did not get down until the fifth day thereafter; he thinks she was down ten or twelve days before she died; he overseed for plaintiff in Baker county, lived in the same house, and saw the negro nearly every day, and also heard plaintiff and family talk about it; whilst the negro was down sick, she complained mostly of her side; the girl was valued at one thousand dollars, as he understood from both parties; the defendant said there was nothing the matter with the girl; this was said after the trade was made; no bill of sale was made, but he now forgets the reason; he took the girl to be sound, but discovered that she had a cough while the defendant was there; she was puny from the time she came, and so continued until she died, complaining mostly of a pain in

the opposing testimony, and at last say whether they will discredit the testimony of the witness sought to be impeached, and consequently give credit to that introduced by way of impeachment, or whether they will discredit the testimony introduced for the purpose of impeachment and credit that of the witness attacked; in a word, it **is the exclusive province of the jury,** under all the attendant circumstances and conditions,

her side; the reason he took her to be a sound negro was, because the defendant said the cough was only the effect of getting wet; if the negro had been sound, she was worth one thousand dollars, but in the puny condition in which she continued from the time of the trade, to the time she was taken down, she was worth very little, and the difference in value would have been nearly the thousand dollars, if her puny condition was owing to unsoundness.

The same witness being introduced in open Court, testified as follows: That he was present at the house of plaintiff, in Baker county, the last of February or the first of March, 1857, when the defendant came there with two negroes; one, Silvia, a dark-brown, about fourteen or fifteen years old, and the other a smaller mulatto girl; the parties made an exchange of negroes; Strozier let Carroll have a negro valued at one thousand dollars, in the trade, and Carroll let Strozier have the girl Silvia, valued at nine hundred dollars, and that Strozier was to pay Carroll one hundred dollars to boot. The witness, on being again asked the question, said Strozier was to pay one hundred dollars to boot. Mr. Strozier stating that he was mistaken, the witness, after some reflection, said: He believed it was Mr. Carroll who was to pay the boot, and that he was confused when he made the first statement, and that it was a mistake; that the trade was begun one evening, but not consummated until next morning; during the negotiation, Carroll said the negro was sound, and that he warranted her in body and mind; Strozier called his attention to a cough she had, and to the complaint she made of a pain in her right side, and Carroll accounted for it by saying that she had taken cold, from a wetting she got a day or two before; the witness was living with the plaintiff that year as an overseer; a few days after the trade was made, Silvia was sent to the field to work; he put her to plowing, and being too unwell for that, he put her to picking up trash, but she was too unwell for that also, and she was then sent to the house, where she continued sick until she died; she was well nursed and attended to during her illness, being kept in Mrs. Strozier's room, and a negro girl taken from the field to wait on her; every time he was about the house she was kept in that room, and attended by Mrs. Strozier and the negro girl; Drs. Bledsoe and Twitty were called to attend her; Dr. Twitty did not get there until the night she died; measles

to determine whether a witness has or has not been impeached. McPherson v. The State, 22 Ga. 479; Strozier v. Carroll, 31 Ga. 557; W. & A. R. R. v. Carlton, 28 Ga. 180: Fish v. Van Winkle, 34 Ga. 339; Shorter v. Marshall, 49 Ga. 31; Williams v. The State, 69 Ga. 14; Franklin v. State, Id. 37; Ford v. The State, 70 Ga. 722; Saul v. Buck, 72 Ga. 254; Hodgkins v. The State, 89 Ga. 761; Lewis v. The State, 91 Ga. 168; Mc-

were in Mrs. Strozier's family at the time; one negro girl then had it, and another took it afterwards; they were kept separate and apart; Silvia did not have the measles; there was a *post-mortem* examination by Dr. Bledsoe; in the morning when the trade was concluded, it was agreed that Mr. Carroll should return in two or three weeks, and execute a bill of sale to Silvia, and receive a bill of sale for the negro man; the reason for the postponement was, that Strozier had the negro man to sell for Mr. Scarboro, on commission, and that he wanted to see him to get him to make the bill of sale; Carroll never returned; witness lived there all the year; his interrogatories have been twice taken in this case—once for the plaintiff and once for the defendant; the first set, for the plaintiff, were taken by ————; the second set, for the defendant, were taken by Bonner and others, as commissioners; Carroll applied to witness for his interrogatories, and he declined to give them; he consulted with Mr. Slaughter, an attorney, who advised him that, as his interrogatories had been once taken in the case, they could not be taken again, and witness continued to refuse; Carroll came to see him for the purpose of getting the second set executed; brought a bottle of liquor with him; took him to Newton; the liquor was drank up by the time they got to Newton; Carroll went first to the grocery to have the bottle replenished, and gave witness to drink, which he did freely; the interrogatories were not then executed, because he refused, upon the advice given him by Mr. Slaughter; afterwards witness was arrested by the sheriff and carried from the place of his residence, six or eight miles to Newton, to the office of Mr. Solomon, where they were taken by Bonner and others; witness was drunk at the time they were taken; he can neither read nor write, and if he swore what he is represented to have sworn in that set of interrogatories, it is not true; if there is any conflict or discrepancy between the contents of the interrogatories taken at the time he was drunk and the first set of interrogatories taken when he was sober, the first contain a true statement of the case, and not the second set; he now attends Court, in person, at the request of the plaintiff, Mr. Strozier, who promised to pay his expenses here, and to pay him for his time; Mrs. Strozier had the negro, Silvia, in her room all the time she was sick, and witness knows that Mrs. Strozier and the negro girl attended her all the time; did not

Tyler *v.* The State, Id. 255; Rome R. R. Co. *v.* Barnett, 94 Ga. 447; Central R. R. Co. *v.* Phinazee, 93 Ga. 488; Duncan *v.* The State, 97 Ga. 180." Powell *v.* State, 101 Ga. 20.

see Mrs. Strozier and the waiting negro only when he was about the house at meal times, and then not all the time he was there; does not know that they were waiting all the time, but they were when he was there; he was in the habit of remaining in Mrs. Strozier's bed-room when about the house; he was most of his time in the field; it was his custom to go to the field before breakfast, and remain there until breakfast time; but on the morning Carroll and Strozier were trading, he did not go to the field, but remained at the house, and was with them all the time until Carroll left, about 8 or 9 o'clock; Carroll sued out a process to compel him to testify a second time; the officer came to Mr. Scurry's, where he was then overseeing, about 12 o'clock in the day, and he went with the officer to the house and ordered a boy to catch his horse, and from Scurry's he went to town with the officer, to Mr. Solomon's office, where his interrogatories were taken a second time; he remembers that Mr. Bonner, Mr. Montgomery and Mr. Hunt acted as the commissioners in taking his interrogatories; Mr. Bonner is a gentleman of high character in Baker county; the witness could walk and talk, but was drunk; Mr. Solomon was the man who sued out the process for Mr. Carroll, to compel him to testify; Strozier, with others, was present in the room part of the time, when the first set of interrogatories were executed; he came down here with Strozier, upon Strozier agreeing to pay his expenses and usual hire per day; Strozier did not say anything at all to him about the case.

DR. BUSHROD BLEDSOE, in answer to interrogatories exhibited by the plaintiff, testified as follows: I am a practicing physician, and, during the year 1857, was called in by the plaintiff to see a sick negro girl, who was about fourteen or fifteen years old, weighing about one hundred and ten or fifteen pounds, of a complexion rather brown, between brown and black, and whose name, to the best of my recollection, was Silvia; she had an abscess of the right lung, and also carese of the rib; she had a bad cough when I first saw her, and complained of a pain in the right side; her respiration was considerably hurried, and she had some fever; I examined her lungs and found them seriously injured; she died on the 31st of March, 1857, at the house of plaintiff, in a good, suitable room, and under careful attendance and treatment; I made a *post-mortem* examination of said negro girl;

I took out the lungs and cut open the right lung, and found a large abscess; the entire lung was affected so much, that when I put it in water, it sank as readily as if it had been a solid piece of flesh; there was not a bronchial tube to be found but what was entirely closed up, and there was a large quantity of pus or matter in the cavity of the chest; I found the ribs seriously affected with carese, whilst the left lung was almost entirely gone, which was the result of former disease; she was designated by the family as the Carroll negro, and I think, from the examination I made, that she must have been diseased at least three or four years; I was called to see her on the 30th of March, 1857, and understood that she had been confined to her bed some three days; I visited her twice, and on the second visit she was dead; I made the *post-mortem* examination at the instance of the plaintiff, who was moved to have it done by Dr. William Twitty, who was present when the girl died; the examination was made the 1st of March, 1857, in about twelve hours after she died; I had no professional assistance in the examination; the plaintiff had no other negroes sick at the time I attended Silvia, that I know of.                    •

WILLIAM McLENDON testified: That in the latter part of December, 1856, or the first of January, 1857, he bought from Carroll a negro girl, by the name of Silvia, at seven hundred dollars, and in the latter part of February, 1857, he sold her back to Carroll for eight hundred and seventy dollars in notes, on which he afterwards realized the money; Carroll told him, at the time he bought her from him, that she was a dirt-eater, as he had been informed, but that during the two months that he (Carroll) had owned her, she seemed to be sound and healthy; when he sold her back to Carroll, he (Carroll) left on the road in the direction of Baker, with the girl, Silvia, and a small yellow girl; witness took no warranty from Carroll when he bought Silvia, and gave none when he sold her back to Carroll; the girl, Silvia, was worth about seven hundred dollars in money.

Mr. SIBLEY testified: That he was acquainted with the character of Isaac S. Johnson, in the neighborhood in which he resides for truth and veracity, and would believe him on his oath in a Court of Justice; Johnson is in the habit of getting drunk, and when so, he is a *"harem scarem"* sort of fellow, not caring much what he says or does; but when

sober, witness would believe him as soon as any man; witness remained over to-day, at Mr. Strozier's request, to testify as to Johnson's character for truth; witness is Strozier's brother-in-law; he never heard Johnson's neighbors speak of his veracity, but bottoms his opinion on his own knowledge of Johnson's character.

Under this testimony, after argument had, and after the charge of the Court, the jury returned a verdict for the defendant.

Counsel for plaintiff then moved for a new trial, on the following grounds:

1st. Because the verdict is contrary to law.

2d. Because the verdict is contrary to evidence.

3d. Because the verdict is manifestly contrary to the weight of the evidence, and without evidence.

4th. Because the verdict is contrary to the charge of the Court.

The presiding Judge overruled the motion and refused to grant a new trial, and this refusal is the error assigned in this case.

J. R. ALEXANDER, for plaintiff in error.

MCINTYRE & YOUNG, for defendant in error.

*By the Court.*—JENKINS, J., delivering the opinion.

This is an action to recover damages, alleged to have resulted from a breach of a warranty of soundness on the sale of a slave, who afterwards proved to be unsound. The case turns upon the fact of warranty. There was none in writing, and but one witness testifies to this point. This witness testified three times in the case—twice by depositions under commission, and once from the witness' stand in open Court. This testimony, as given on each occasion, was before the jury. Looking to it as delivered on the first and last occasions, there was evidence of a warranty; looking to it as delivered on the intermediate occasion, there was no evidence of warranty. Twice he swears he was present when the trade was made; once he swears he was not so present. This witness stood before the jury self-impeached. It is very manifest, they discredited him. The rule is, that the credibility

of a witness is a question for the jury. How can it be otherwise, when the object of his testimony is to produce conviction on *their* minds. Conceding, for the argument, that there may be exceptions to the rule, cases of credit denied to witnesses, by the jury, so flagrantly wrong, as to require the interposition of the Court (as I am disposed to hold), we think this is not such a case. The Judge who presided on the trial, refused, upon motion made, to disturb the verdict, and this is· the error assigned. Believing he committed no error, we affirm: the judgment.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court,. that the judgment of the Court below be affirmed.