## POWELL *v.* THE STATE.

1. Evidence offered in a trial for murder to show the character of the deceased for violence, will, as to the party making the attack, be confined to the reputation which the deceased bore in the community, and will not extend to specific acts.

(*a*) Reputation for character, good or bad, may be proved by showing what people generally say; and reputation for good character may be proved by testimony showing that no one within the knowledge of the witness had spoken ill of the character of the person under investigation. Accordingly, a witness may be allowed, after showing his acquaintance with the

person inquired of, to testify that he had known him a long while and lived in the same community with him, and had never heard his reputation or character for peaceableness questioned or attacked. This is competent evidence for the jury to consider, giving it the effect to which they think it entitled.

(*b*) Such evidence, while negative, tends to show good character ; but any evidence depending on the knowledge of the witness, save what he has as to the reputation of the deceased, should be excluded.

2. Evidence of pain and suffering by the accused on trial for murder, and who alleges in his defense that he was attacked and beaten by the deceased, is admissible, if confined to a reasonable period of time elapsing after the homicide ; and exclamations or expressions indicating the existence of present pain and suffering, made by him on the same day of the homicide, whether given in the course of a medical examination or while describing his particular pain or trouble to another, are entitled to go to the jury. Such complaints may or may not have probative value, but of this the jury, under the circumstances of each case, must decide.

3. In every case it is largely within the discretion of the trial judge, at any stage of the proceedings, to permit the case to be opened and new evidence submitted by either party, and this court will not reverse the court below in the exercise of such discretion, unless it appears that from an abuse thereof the plaintiff in error has lost some substantial right the allowance of which would have probably affected the verdict rendered.

4. A declaration made by one who is charged with murder, admitting the homicide but in effect disavowing any criminal responsibility therefor, is not a confession of guilt, but may in some instances be treated as an admission of a fact, which, in connection with other facts, may tend to incriminate. Such an admission, while admissible in evidence, does not authorize a charge on the law of confessions.

(*a*) A witness testified that he saw the accused in the court-house after the homicide, and heard him say "his conscience did not bother him any more about Reid [the deceased] than if he had killed a damned dog ; that he was sorry for his wife and on Reid's wife's account." This was not a confession that the accused was guilty of the crime of murder. It may have amounted to an admission that the accused had killed Reid, and could properly be considered in connection with any evidence tending to show a felonious intent ; but a charge on the legal effect of confessions of guilt, based on such an admission, was error.

5. It being the exclusive province of the jury to determine the credibility of all witnesses, when an effort is made by any of the methods pointed out by law to impeach a witness, the jury then become the triors of the credibility, respectively, of the witness sought to be impeached, and of the witness or witnesses by whose testimony the impeachment is attempted; and, accordingly, they have the right, under all the attendant circumstances and conditions, to determine whether credit shall be given to the witness whose credibility has been attacked, or to the witness or witnesses by whose testimony such attack is made, and thereupon decide whether the witness has or has not been impeached.

(*a*) Under the previous rulings of this court, if a witness has been im-

peached, it is the duty of the jury to disregard his testimony, unless corroborated in material particulars.

(b) The seeming conflict existing between those cases ruling, in substance, that, though a witness may be impeached and may not be afterwards corroborated, yet it must still be a question for the jury whether he is to be believed or not, notwithstanding the "impeachment," and those cases holding that it is the duty of the jury to disregard the testimony of an impeached and uncorroborated witness, grows out of a failure, in applying the doctrine, to keep in mind the distinction between impeachment and an attempt to impeach, and as to the duty of the jury in dealing with the testimony of an impeached witness and that of a witness whose credibility has been attacked by way of impeachment. The incautious use of the terms "impeachment" and "attack upon the credibility" as synonymous, has caused most, if not all, of the difficulty. A witness is never impeached, in contemplation of law, until there is a mental conviction, produced upon the mind of the jury by proof, that he is unworthy of credit.

6. On a trial for murder by shooting, when the accused claimed that the deceased made an attack on him and that he shot in self-defense, it is error for the court, after having given to the jury a legal charge covering all the grades of homicide established by our law, to instruct the jury, in conclusion, as follows : "Now look to all the facts and circumstances surrounding and connected with the case ; if you find that the defendant and deceased had a difficulty, look to all the facts and circumstances surrounding and connected with it ; see whether or not it was necessary for the defendant to take the life of the deceased in order to save his own life. Before he would be justified and you would be authorized to find him guilty of no offense, you must believe from the evidence that it was necessary for him to take the life of the deceased in order to save his own life." Such a charge excludes from the consideration of the jury the question whether the accused shot and killed deceased to prevent the commission of a felony on his person, under the rules of law.

(a) It is justifiable homicide for one to kill another who manifestly intends or endeavors by violence or surprise to commit a felony upon him , and this is true whatever the grade of the felony may be.

7. A charge which excludes one element of justification and makes justification rest entirely on another and distinctly different theory, although the latter be correct in the class of cases to which it applies, is restrictive of the right of the accused to have the law based on all the theories of the case given to the jury; and where such is the case, a new trial will be awarded.

Argued March 1, — Decided April 2, 1897.

Indictment for murder.    Before Judge Smith.    Wilcox superior court.    September term, 1896.

J. F. Powell was indicted for the murder of S. J. Reid, and was found guilty of voluntary manslaughter.    His motion for new trial was overruled, and he excepted.    There was testi-

mony for the State by Dr. Page, who was 80 or 90 steps away from the place where Reid was killed, that he saw defendant and Reid talking, defendant standing against an oil-tank at Reid's place of business, shaking his finger, and while thus engaged Reid suddenly sprang from his seat and seized defendant. Witness did not know whether he caught hold of defendant or not, but almost immediately after he seized him a pistol was fired and Reid staggered around while defendant walked out on the street. The testimony for the defense was, in brief, that in the conversation between the parties to the rencounter, together with other persons present, one of these others having remarked to defendant that the grand jury had given his camps "a pretty good send-off," defendant replied that the surroundings of his camp were as good as those of George Williams (who it seems was a member of the grand jury in question, and was a relative of Reid). Thereupon Reid told defendant not to reflect on Williams's wife in any such way; and defendant replied that he was not reflecting on Williams's wife, that she was a lady so far as he knew; and repeated that the surroundings of his camp were as decent and clean as those of Williams or any one else. Reid said, "God damn you, don't you repeat that again"; to which defendant replied that he meant it, and that it was as clean as the surroundings of any one's place. Upon this Reid cursed him violently, jumped from the chair where he was sitting, seized defendant's throat and shoved him back over the box in which the oil-tank stood, and began choking him. Witnesses tried to pull Reid off, but could not do so. The choking caused defendant's eyes to roll and his tongue to protrude. After some struggling he fired a pistol which he pulled from his pocket, and thereupon Reid's hold relaxed and he attempted to get the weapon (it having fallen from defendant's hand), saying, "I will kill you, God damn you." There was testimony to the effect that Reid was the larger and stronger man of the two, and might have been able to kill defendant by choking him; and that Reid had some reputation for violence, while defendant's character for peaceableness was good. Much testimony was offered by way of impeachment of various witnesses.

The motion for new trial contains the following among other grounds.

(1) W. A. Rodgers, a witness for the defense, on direct examination testified that he thought he was acquainted with the general reputation and character for desperation of Reid while he was living. To the question, "Was that character good or bad?" he answered: "I don't know how to answer the question. I don't know what makes it good or bad." The court said, "It is not what you know yourself; it is the reputation that he bore with the people, what the people generally said about him." The witness: "People generally said he was a fussy man." Error is assigned, in that the court excluded the witness from testifying to any other knowledge he had of the character of Reid for violence and turbulence, save that he got from general reputation and the sayings of others.

(2) The same witness having so testified, the following cross-examination occurred: "Q. Who did he have a fuss with? A. Col. Eason, I have heard of several; I have never seen him have any. Q. You lived here several years with him? A. Yes, sir. Q. Engaged in business in the same little town? A. Yes, sir. Q. Only about five or six hundred people there? A. It is a small town, eight hundred or a thousand people. Q. Not over a thousand? A. No, sir. Q. Everybody knows everybody? A. Yes, sir. Q. And you know everything going on there? A. Usually I think I do. Q. You didn't know of his having any difficulty with anybody? A. I knew that he had a fight with Mr. Hamilton. Q. And had a dispute with Wade McConnell about a negro? A. I have heard of that. I understood he had some hard feeling with Mr. Henry Mashburn. I don't know to what extent. Q. Don't men have hard feelings with others that are not very desperate men? A. I suppose they do. Q. Those difficulties mentioned are about all that you have heard of, ain't they? A. No, sir; those are not all I have heard of; I have heard he had a difficulty with Mr. Neil Connor and Mr. Needam Connor. Q. He didn't have a fight, did he? A. I think not. Q. Did he shoot or cut any of them? You never heard of his shooting or cutting any of them, did you? A. Never did." On redirect examination

the witness was asked, "How was he regarded generally by the people who lived in the town there, as to his general character?" On objection, the court ruled that defendant's counsel could not go into specifics. Error is assigned, because the question is not one calling for specific acts of violence, but only as to general character, in direct response to the line of cross-examination; and because it was the right of defendant's counsel to examine the witness as to specific acts which were brought out on cross-examination, and he was debarred therefrom by said ruling of the court.

(3) J. H. Hamilton for the defense testified, on direct examination, that he knew Reid; and was asked, "Do you know his general character for desperation?" The court said, "Not what you know, but what is said of him in the community where he lived." The witness answered, "Yes, if you are going by hearing." Q. "Was that character good or bad?" A. "It was a bad character." Error is assigned, in that the court so restricted the witness as to exclude his personal knowledge, and required him to testify only to what he had heard from others.

(4) Similar assignment of error upon a like ruling as to the testimony of Ned Sapp, a witness for the defense.

(5) Upon cross-examination of Dr. Page, a witness for the State, the following occurred: "Doctor, what was the general disposition and character of Reid? A. He was mighty quick to resent an insult. Q. Wasn't he rather quick to give an insult? Objected to, as not a proper question. Q. What is his general character for desperation? Objected to, no grounds of objection given. By the court: Ask him if he is acquainted with his character. Q. Were you acquainted with his general character? A. Yes, sir. Q. What was it? A. He was pretty quick to resent an insult, if it became necessary. I had never known of his getting into but one difficulty while I was there. Q. How long have you been there? A. Three or four years. Q. Don't you know of his being in a difficulty with the town marshal? A. He was locked up once. Q. Don't you know he was very frequently in difficulties with everybody? A. I don't think he got into a fuss but once or twice while I was

there.　Q. Was he looked upon as a good, law-abiding citizen? Objected to by counsel for the State, as not a proper question. By the court: Don't answer that question." Error is assigned, because the court limited the right of cross-examination by defendant's counsel, and because the question was proper in showing, by an unwilling witness for the State, the character of the deceased for violence and turbulence.

(6) Similar assignment of error as to the testimony of T. A. McLane, a witness for the defense.

(7) R. E. Wishart, a witness for the defense, testified that he saw defendant on the day of the homicide, and examined him at the jail; that he saw on the left side of defendant's neck a print that looked like finger-prints, the print of two fingers. The question was asked, "What seemed to be his condition then, with reference to swallowing?" and the witness answered, "He was complaining of being sore." Upon objection the court ruled out what defendant said. The witness was further asked, if defendant seemed to have trouble to swallow; and answered, "I don't think he did; he was just complaining of his throat being sore." Error is assigned upon the court's ruling, because the prisoner's sayings at the time of the examination of said wound, as to the pain he was suffering, were admissible.

(8) Similar assignment of error upon the ruling out of like testimony of sheriff Pollock.

(12) Because the court erred in the following ruling: After both the plaintiff and defendant had closed their testimony and the defendant had discharged his witnesses, the solicitor-general moved to reopen said case to allow him to prove by Mr. Wimberly that, a short time after the difficulty, he took a drink with Dr. Powell and saw his neck, and that his collar was not ruffled, and that there were no abrasions upon his neck. This was the whole showing that he made. The defendant objected to reopening, on the ground that he had discharged his witnesses, and that Wimberly was sitting present in the court when counsel stated what he expected to prove by him, and that there had been requested by defendant a sequestration of the witnesses; that Wimberly was the postmaster and had been excused by the court to attend to the office, and

had not been in the court during the hearing of the evidence. The court overruled the objection and allowed the testimony of Wimberly.

The other material grounds are shown by the opinion.

*D. M. Roberts, E. Herrman, Hardeman, Davis & Turner* and *E. H. Williams,* for plaintiff in error.

*J. M. Terrell,* attorney-general, *Tom Eason,* solicitor-general, *Hal Lawson, D. B. Nicholson* and *J. H. Martin,* contra.

LITTLE, J. A number of grounds are set out in the motion for a new trial, which was overruled. Inasmuch, however, as the case goes back for another trial, we purposely omit consideration of such of them as we do not deem material to be decided for the purposes of another hearing.

1. The first six grounds of the amended motion are based on the rulings of the court where witnesses were introduced by the defendant to show the character of the deceased for violence. Without going into the details of the rulings set out in these several exceptions, it is sufficient here to say that, except when special facts may have been shown to have existed in a particular case, proof of character, conduct or utterances of the deceased is not admissible in evidence in trials for homicide, because neither of them will ordinarily justify or extenuate the killing. 2 Bishop's Crim. Proc. § 609. In the class of cases, however, where the defendant rests his defense on the claim that he acted in self-defense, the particulars and details of his action become material, because the law judges him by the necessity for his action as it truly appeared to him, and he may then legally give in evidence such things known to him of the character, prior conduct or threats of the person with whom he was contending as may justly be considered as affecting his action which brought about the homicide, and as well of " a generally known evil trait of a sort which might properly influence his conduct, as that the attacking person was in character quarrelsome and dangerous." 2 Bishop's Crim. Proc. §§ 610, 613 ; *Doyal* v. *The State,* 70 *Ga.* 134. Such evidence must, however, be confined to the general reputation of the deceased, and this can not be established by proof of specific acts. *Doyal* v. *The State,* supra.

It is not proper, in such examinations, when the question of the character of the deceased for peace or violence is in issue, to confine the testimony of the witness, in establishing general reputation, to proof of what is generally said in reference to the same. It is competent to show by a witness who lives in the same community with the person whose character is in issue, that he knows the estimation in which he is held by the people, and that he has never heard the character of such person questioned. If a witness called to prove the character of another were confined alone to the question as to what people said about a given person, such evidence would not in all cases tend to show the true standing of the person inquired about. If nothing has been said in the community in which a man lives against his honesty and integrity; if it has never in any way been called in question, it would hardly be fair or reasonable to conclude that, because such questions had never been raised, the person inquired about had not any established character for such virtues. On the contrary, proof of the fact that no question had ever been raised against him in this regard, authorizes the inference that the character is good. What people in the neighborhood generally say is a fundamental source of inquiry by which character may be established; but if the witness is prepared to testify that he has never heard the character of the deceased for peaceableness questioned, that he has lived in the same community with him for any considerable length of time and has mingled with persons who knew him, it is competent evidence; and the result of such testimony is to show that the witness did in fact sufficiently know the general character of the person inquired about, to entitle him to testify in relation thereto. *Flemister* v. *The State*, 81 *Ga.* 768; *Hodgkins* v. *The State*, 89 *Ga.* 761.

2. The seventh and eighth grounds of the motion for new trial assign as error the refusal of the presiding judge to admit in evidence testimony that the defendant complained of his throat being sore, the witness having previously testified that he had seen marks like finger-prints on the side of the defendant's neck, and the theory of the defendant's case being that the deceased attempted to commit a felony on his person by

choking him at the time he shot the deceased. Complaints of pain made by the defendant, under such circumstances, are admissible. *Atlanta St. R. R. Co.* v. *Walker* 93 *Ga.* 467; *Broyles* v. *Prisock*, 97 *Ga.* 643; 1 Greenl. Ev. § 102. What probative value such evidence, when admitted, may have, must vary according to the circumstances of each case. It may amount to very little, or, indeed, have no weight as affecting the result of the trial, or there may exist circumstances under which it would have a greater value. But in any event, what value is to be attached to it must be left to the determination of the jury charged with the ascertainment of the truth of the accusation made, and it comes to them as any other fact as part of the history of the case.

3. The twelfth ground of the motion alleges error in the ruling of the court by which the case was reopened and new evidence introduced after the same had been closed and the defendant's witnesses discharged. Under the repeated rulings of this court, being so general as to need no citation, the question of reopening a case at any particular stage of the proceedings to let in additional testimony is largely in the discretion of the court and must necessarily be so; and we are not prepared to say that the court abused his discretion in the present instance.

4. The court charged the jury the law in relation to confessions. The foundation for this charge is to be found alone in a statement testified to by witness Homer Adams, which was to the effect that he saw the prisoner after the killing in the court-house at Rochelle and heard him speak in relation to the killing as follows: "He said that his conscience did not bother him any more about killing Reid than if he had killed a damned dog. He said he was sorry for his wife and on Reid's wife's account." In opening his charge to the jury, the court instructed them that the defendant admitted the shooting, but insisted that it was done under circumstances of justification. The whole evidence and statement of the prisoner show that the question of whether the defendant did the shooting was not the real issue. The words used by the defendant, according to the statement of the witness, were in no sense a confession of guilt. They constitute certainly a criminating admission

that he killed Reid. Further than this, the words tended to deny guilt in the commission of the act, in that his conscience justified the act. As a criminating admission against him his statement was admissible in evidence; but the court, in charging the jury, overlooked the distinction between confessions of guilt and admissions of mere evidentiary facts not inconsistent with innocence, and accordingly erred in treating the statement as a sufficient basis for giving in charge to the jury the law relating to confessions. *Dumas* v. *The State*, 63 *Ga.* 600; *Fletcher* v. *The State*, 90 Ga. 468; *Nightengale* v. *The State*, 94 *Ga.* 395.

5. In the twentieth ground of the motion for new trial it is urged that the court erred in its charge to the jury in relation to the impeachment of witnesses. The charge complained of is in the language following: "I charge you that a witness may be impeached by proof of contradictory statements; and if you believe that any witness has been successfully impeached, why then it would be your duty to discard the evidence of such witness, but it is for you to say whether or not you will believe the witness sought to be impeached, or the witness brought to impeach him; the credibility of all witnesses being for you and your consideration. If you believe that any witness has been successfully impeached in reference to contradictory statements upon some material issue in the case, and it must be some material issue in the case, then you would not be authorized to believe him, unless you find that he has been corroborated. He may be corroborated, or he may be sustained by proof of good character, or by other facts and circumstances in the case." The proposition is laid down in 2 Thompson on Trials, § 2426, that the trial judge, in cautioning the jury in respect of the testimony of witnesses sought to be impeached, may instruct them that "in determining the guilt or innocence of the defendant they are to consider the entire evidence in the case, but they are at liberty to disregard the statements of such witnesses (if any there be) as have been successfully impeached, either by direct contradiction or by proof of general bad character, unless the statements of such witnesses have been corroborated by other evidence which has not been impeached." See also 39 Ill.

463; 101 Ind. 109; 66 Iowa, 152; 84 Ind. 12. The jury are the exclusive and sole judges of the credibility of all witnesses. *Merchants Bank* v. *Trustees*, 62 *Ga.* 271; *Walker* v. *State*, 72 *Ga.* 200; *White* v. *Hammond*, 79 *Ga.* 182; *Cleghorn* v. *Janes*, 68 *Ga.* 87. Therefore, when the credibility of a witness is attacked as by an effort to impeach him in any of the methods pointed out by law, the jury then become the triors of the credibility of the witness sought to be impeached, and of the witness or witnesses by whose testimony the attack is made; they are to weigh the opposing testimony, and at last say whether they will discredit the testimony of the witness sought to be impeached, and consequently give credit to that introduced by way of impeachment, or whether they will discredit the testimony introduced for the purpose of impeachment and credit that of the witness attacked; in a word, it is the exclusive province of the jury, under all the attendant circumstances and conditions, to determine whether a witness has or has not been impeached. *McPherson* v. *The State*, 22 *Ga.* 479; *Strozier* v. *Carroll*, 31 *Ga.* 557; *W. & A. R. R.* v. *Carlton*, 28 *Ga.* 180; *Fish* v. *Van Winkle*, 34 *Ga.* 339; *Shorter* v. *Marshall*, 49 *Ga.* 31; *Williams* v. *The State*, 69 *Ga.* 14; *Franklin* v. *The State*, Id. 37; *Ford* v. *The State*, 70 *Ga.* 722; *Saul* v. *Buck*, 72 *Ga.* 254; *Hodgkins* v. *The State*, 89 *Ga.* 761; *Lewis* v. *The State*, 91 *Ga.* 168; *McTyier* v. *The State*, Id. 255; *Rome R. R. Co.* v. *Barnett*, 94 *Ga.* 447; *Central R. R. Co.* v. *Phinazee*, 93 *Ga.* 488; *Duncan* v. *The State*, 97 *Ga.* 180.

Some confusion seems to have arisen in the application of this doctrine, by reason of a failure, in applying it, to keep in mind the distinction between the impeachment of a witness and the attempt to impeach, and as to the duty of the jury in dealing with the testimony of an impeached witness, and that of a witness whose credibility has been attacked by way of impeachment, the terms "impeachment" and "attack on the credibility" of a witness by way of impeachment, being treated as synonymous. It is a solecism to say that a witness has been successfully impeached. It is altogether proper to say that an attempt to impeach the credibility of a witness has proved successful. Impeachment, in evidence, is "an allega-

tion, supported by proof, that a witness who has been examined, is unworthy of credit." 1 Bouvier's Law Dictionary, 774; to same effect see Black's Law Dictionary, 593. It is the allegation, supported by *proof*. By the latter author proof is defined to be "the logically sufficient reason for assenting to the truth of a proposition advanced." See page 441. "Proof, in civil process, is a sufficient reason for the truth of a juridical proposition by which a party seeks either to maintain his own claim or to defeat the claim of another." Whart. Ev. § 1. "Proof is the effect of evidence ; the establishment of a fact by evidence." Code Civ. Proc. Cal. § 1824. Ayliffe defines "juridical proof" to be a clear and evident declaration or demonstration of a matter which was before doubtful, conveyed in a judicial manner." Ayl. Par. 442. When a witness is impeached, his unworthiness of credit is absolutely established in the mind of the jury. The incautious use of the term "impeachment," and treating that term as synonymous with an attack upon the credibility of a witness by way of impeachment, as, for instance, in *McPherson* v. *The State*, 22 *Ga.* 479, where this language is used : "Although a witness may be impeached, and may not afterwards be corroborated, yet it must be a question for the jury whether he is not still to be believed, notwithstanding the impeachment"; and similar expressions to be found in 28 *Ga.* 180 ; 34 *Ga.* 339 ; 49 *Ga.* 31 ; 69 *Ga.* 37 (10); 89 *Ga.* 765, have tended to suggest an apparent conflict between those cases holding that the jury "may believe an impeached witness, notwithstanding the impeachment," and those cases, as for instance, 69 *Ga.* 14 (28); 72 *Ga.* 254, holding that if a witness has been "successfully" impeached, it is the duty of the jury to disregard or discard his testimony, unless corroborated. With reference to the use of the term "impeached" in the cases first above referred to, the observations of Mr. Justice Lumpkin, in the case of *Duncan* v. *The State*, 97 *Ga.* 180, are applicable ; which are to the effect, that by the use of the term "impeached" the court evidently referred to the attack which had been made upon the credibility of the witness or witnesses. He says, "It is more accurate, where one or more witnesses testify that another

witness is of bad character and therefore not to be believed, to say that the credibility of the latter has been attacked, or that an effort to impeach him has been made, rather than to say flatly that he has been impeached. The court would not be authorized to tell the jury in plain terms that any witness had been impeached, in the sense that he had been successfully discredited."

Tested by the previous rulings of this court, there is no error in the charge complained of. Properly interpreted, the charge was an instruction to the jury that it was primarily a question for them whether any witness had or had not been impeached; that any witness sought to be impeached by proof of contradictory statements upon some material issue in the case, might be sustained by proof of good character or by other facts and circumstances; that is, in determining the question of impeachment, they were to consider these things; and lastly, the instruction that if the jury should determine any witness had been impeached, it would be their duty to disregard his testimony, was qualified by the further instruction that they would be so authorized, unless such witness had been corroborated.

6, 7. The twenty-second ground of the motion for new trial alleges that the court erred in the following charge to the jury: " Now look to all the facts and circumstances surrounding and connected with the case. If you find that the defendant and the deceased had a difficulty, look to all the facts and circumstances surrounding and connected with it. See whether or not it was necessary for the defendant to take the life of the deceased in order to save his own life. Before he would be justified and you would be authorized to find him guilty of no offense, you must believe from the evidence that it was necessary for him to take the life of the deceased in order to save his own life."

The defendant in this case admitted the killing, but insisted that he was justifiable in shooting the deceased at the time. The charge of the court was quite full, and in the main satisfactory as explanatory of the law of homicide. After charging the grades of murder and manslaughter, the court did

charge the law of justifiable homicide as found in the Penal Code, § 70, and the effect of reasonable fear of the offenses designated in that section as provided in the succeeding section, and likewise charged the law of justifiable homicide as laid down in section 73 of the Penal Code. These charges were made before the particular charge complained of was given. The latter, notwithstanding the former part of the charge, might be construed to have been a general summary of the law of justifiable homicide occupying the concluding part of the charge on the subject of justifiable homicide. As an abstract proposition of law, the charge was error. As a proposition of law applicable to a certain class of cases, it was not error; but inasmuch as the defendant relied on justifiable homicide, this charge, purporting as it does to state the proposition that, in order for the act of the defendant to be justifiable, it must be shown that it was necessary for the defendant to take the life of the deceased in order to save his own life, does not correctly state the law of justifiable homicide. The two sections of the Penal Code, 70, 73, are parts of the common law. Sir William Blackstone, in the fourth book of his Commentaries, top pp. 134–137, in treating of justifiable homicide, uses this language : "In some cases homicide is justifiable, rather by the permission than by the absolute command of the law, either for the advancement of public justice, or in such instances where it is committed for the prevention of some atrocious crime." This is true "by the law of nature, and also by the law of England, as it stood so early as the time of Bracton, and as it is since declared in statute 24 Hen. VIII., ch. 5 (5)." Further on, the same author, top pp. 138–39, treating of excusable homicide, declares that "Homicide in self-defense, or *se defendendo*, upon a sudden affray, is also excusable, rather than justifiable, by the English law"; and is that "whereby a man may protect himself from an assault or the like in the course of a sudden broil or quarrel, by killing him who assaults him. And this is what the law expresses by the word *chance-medley*. . . It is frequently difficult to distinguish this species of homicide . . from that of manslaughter. . . But the true criterion between them seems

to be this: when both parties are actually combating at the time when the mortal stroke is given, the slayer is then guilty of manslaughter; but if the slayer has not begun the fight, or (having begun) endeavors to decline any further struggle, and afterwards, being closely pressed by his antagonist, kills him to avoid his own destruction, this is homicide excusable by self-defense." Sir Matthew Hale, in his Pleas of the Crown, chapter 40, makes and preserves the same distinctions. Later common-law writers, Russell, Chitty, Wharton, Bishop, and all others, so far as we have investigated, draw the same distinctions, from which it is evident that the compilers of our Penal Code, in the separation of these two classes of homicide, meant to continue the distinctions which existed at common law and which were there denominated, respectively, *se et sua defendendo* and *se defendendo* as applicable to two different classes of homicide. As the effect of a homicide *se defendendo* and *se et sua defendendo* was in law the same, the statute, while preserving the distinction as to the facts which would justify the one and excuse the other, abolished the common-law classification of excusable and justifiable homicide. This doctrine is not a new one in our criminal jurisprudence, but one well known, and it may be that unnecessary reference is here made to the history of the two sections of our code. The distinction has time and again been recognized and applied by this court (see *Monroe* v. *The State,* 5 *Ga.* 85; *Haynes* v. *The State,* 17 *Ga.* 465; *Keener* v. *The State,* 18 *Ga.* 194; *Aaron alias Bryant* v. *The State,* 31 *Ga.* 167; *Pound* v. *The State,* 43 *Ga.* 88; *Killen* v. *The State,* 50 *Ga.* 230; *Johnson* v. *The State,* 72 *Ga.* 694; *Crawford* v. *The State,* 90 *Ga.* 701), and would not be referred to at this length, were it not that we have a certain class of cases where the distinction is not drawn, and which, if followed, would seem to be in conflict with the principle announced in the above cases, as well as the ruling in this. As examples see *Hinch* v. *The State,* 25 *Ga.* 699; *Stiles* v. *The State,* 57 *Ga.* 183; *Wilson* v. *The State,* 69 *Ga.* 224; *Heard* v. *The State,* 70 *Ga.* 597; *Darby* v. *The State,* 79 *Ga.* 63; *Jackson* v. *The State,* 91 *Ga.* 271.

It must not be understood that we either rule or intimate that the law of justifiable homicide *se defendendo,* as embodied in

the Penal Code, § 73, is not good law.   On the contrary, it is too well established and rests on too firm a principle to be questioned.   In the cases to which it is applicable, it is the controlling law, and is supported by reason and the highest principles of justice.   What we do mean to say is, that it is not applicable to cases of homicide where, for instance, the guilt of the accused is to be determined by the application of the law which justifies the homicide when done to prevent the commission of a felony, as provided in the code.   It is undeniably true that a homicide committed in self-defense or in defense of habitation, property or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either, is justifiable homicide.   It is also justifiable homicide to take the life of persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein.   The only limitation which attaches to the justification of a homicide falling under these classes is, that the circumstances be sufficient to excite the fears of a reasonable man that the felony or riotous entry set out is about to be committed, and that the party slaying really act under the influence of those fears and not in a spirit of revenge.

An examination of these two sections will show that full liberty and power is given to the citizen who acts in good faith to protect himself, his family, his habitation and his property.   It will further show that the law does not encourage the wanton or careless slaying of another; that on an occasion when two persons are at fault, when they willingly engage in an affray the one with the other, the law imposes a duty on the slayer, and that is that he shall be free from blame.   To justify such a one, it is not sufficient that the other is attempting to seriously injure him.   Having willingly engaged in the affray, he is in equal fault with the other, and under such circumstances it is not justifiable for him to slay his adversary without more.   He must repent; he must endeavor to withdraw from the difficulty ; and after having used his utmost endeavors to escape from his adversary, it is only

justifiable for him, after having exhausted his opportunities to withdraw from the contest, to take the life of his adversary when it is absolutely necessary for him to do so in order to save his own life.

It is entirely proper that these two sections of the code and these two theories of justifiable homicide should have been given in charge to the jury by the presiding judge in this case. It would not have been proper for him to have assumed, under the contentions raised, that this homicide occurred under circumstances which would make it justifiable under either one of the theories contended for; that was a question exclusively for the jury; and having been charged with the law applicable to justifiable homicide under the two theories, the jury could and would have applied the same according to the evidence as they believed it to be. The error which we hold has been committed is, that, having given properly all the law in both sections of the code relating to justifiable homicide, in summing up his charge and in the concluding part of it, the jury were instructed to "see whether or not it was necessary for the defendant to take the life of the deceased in order to save his own life. Before he would be justified and you would be authorized to find him guilty of no offense, you must believe from the evidence that it was necessary for him to take the life of the deceased in order to save his own life." As a conclusion of the whole law, the jury might have understood from this charge that unless it was necessary for the defendant, in order to save his own life, to take that of the deceased, he would not be justifiable. According to our view this is not a correct interpretation of the law, and the defendant is entitled to a new trial because of that fact.

*Judgment reversed.    All the Justices concurring.*