## ARNOLD *v.* THE STATE.

1. Where on the trial of one for murder the homicide is admitted, and the material question is whether it was wilful or accidental, the conduct of the defendant in shooting at the sister of the deceased, as she ran from the house immediately after the defendant had mortally wounded her brother, and her screams for help, are parts of the res gestæ, and relevant to the issue.

2. While a person accused of crime may put his general character in issue, a witness called by him to show his general character will not be permitted on his examination in chief to testify as to particular instances, or special traits, which do not bear upon the peculiar nature of the crime charged.

3. Where testimony is offered as a whole, some of which is competent and some not, a new trial will not be granted because of its rejection.

4. In defining a reasonable doubt it is not error to instruct the jury that a reasonable doubt "is just such a doubt as its name implies, not a vague conjecture nor fanciful doubt, but it is such a doubt that you, as trial jurors, can give a reason for having."

5. The charge on the subject of impeachment of witnesses was within the ruling in *Powell* v. *State,* 101 *Ga.* 19-22; *Smith* v. *State,* 109 *Ga.* 479 (2).

Submitted October 19,—Decided November 11, 1908.

Indictment for murder. Before Judge Wright. Floyd superior court. June 24, 1908.

*J. W. Wise* and *G. E. Maddox,* for plaintiff in error.

*John C. Hart, attorney-general,* and *W. H. Ennis, solicitor-general,* contra.

EVANS, P. J. John Arnold was convicted of the murder of Harris Rodney, and recommended to mercy. He made a motion for a new trial, which was refused, and he excepts.

1. The deceased was slain at the house of his sister, at about ten o'clock at night. At the time of the homicide the deceased, his sister, and her two infants were the only persons in the house. The defendant demanded that he be allowed to come in the house, and, upon being refused, he forced an entrance, and in a struggle with the deceased killed him. The sister in narrating the occur-

rence was allowed to testify, over objection, that immediately upon the defendant shooting her brother she ran out of the house, and the defendant shot at her four times while she was running; that she ran across the street to Sadie Brock's, calling upon her to run and help her brother, and stating that defendant had shot him and would kill him; that Sadie Brock told her father not to go, but to get a policeman. While this was going on, witness and Sadie Brock entered the house, and by that time the defendant had come on the porch. The specific objection to this testimony was that it related to occurrences after the killing, and included a conversation with a third person not in the presence of the defendant. In his statement the defendant claimed that the killing was accidental, and that the pistol was unintentionally discharged in a scuffle with the deceased and his sister. The testimony to which objection was made was but a part of the narrative of the circumstances of the homicide. The immediate flight of the witness, the firing upon her by the defendant as she was fleeing, her instant appeal for help, were so closely connected with the firing of the fatal shot as to become a part of the res gestæ, and were material in determining whether the shooting was wilful or accidental. *Pool* v. *State*, 87 *Ga.* 526 (13 S. E. 556). It is not certain whether the conversation was heard by the defendant, who had followed her, but the evidence is strongly indicative that it occurred within his hearing, if not actually in his presence. Even if the conversation relative to getting a policeman was inadmissible, the error in admitting it was so manifestly harmless that a new trial should not be had on that account alone.

2, 3. The defendant offered to prove his good character by several witnesses, one of whom was C. T. Clements. The fourth ground of the motion for a new trial complains that the court erred in ruling out the following testimony of this witness: "Q. Are you acquainted with John Arnold's general character in the community in which he lives? A. Yes, sir, I think I am pretty well acquainted with it. Q. Is that character good or bad? A. He had the character of being a good man, so far as laboring and being peaceable and quiet was concerned; he was respectful to both white and black." It appears from the brief of evidence that this witness was allowed to testify that he had known the defendant about two years; knew his character in the community

pretty well; that his character was good except that he had the reputation of drinking some.

We fully concede that it is the right of a person accused of crime to put in issue his general character. In examining the witnesses called to establish his character the defendant may inquire of them how long they have known him, and their opportunities of forming a knowledge of his character. *Peeples* v. *State,* 103 *Ga.* 629 (29 S. E. 691). But a witness called by the defendant to show his good character will not be permitted on his examination in chief to testify as to the particular instances or special traits which do not bear upon the peculiar nature of the crime with which the defendant is charged. Thus a man on trial for murder will not be permitted to show his character for industry. State *v.* Dalton, 27 Mo. 13. The witness in this case was allowed to swear that the character of the accused was good. The excluded answer was not so positive in its endorsement of the defendant's character as the evidence which was admitted. Testimony that the defendant's general character for peaceableness was good was relevant. But from the form of the question it seems his purpose was to put in issue his general character, and not his character for peaceableness. If the court had allowed the witness to answer the question in the manner the witness would have answered it, the effect would have been to allow the defendant to establish his good character from his habits of industry, and being respectful to white and black people. The evidence was offered as a whole; and the rule is well settled that where evidence, some of which is admissible, and some of which is not admissible, is offered as a whole, a new trial will not be granted because of its rejection. *Central R. Co.* v. *Skellie,* 81 *Ga.* 56 (6 S. E. 811); *Smalls* v. *State,* 99 *Ga.* 26 (25 S. E. 614); *Ellis* v. *Poe,* 109 *Ga.* 422 (34 S. E. 567).

4. The court charged that the defendant "goes into the trial of the case presumed to be innocent, and that presumption remains with him throughout the trial and entitles him to an acquittal at your hands, unless the State by evidence legally and satisfactorily establishes his guilt, not to a mathematical certainty, for that is not required, but the State is required to establish his guilt to a moral and reasonable certainty and beyond a reasonable doubt. That doubt, gentlemen, is just such a doubt as its name

implies, not a vague conjecture nor fanciful doubt, but it is such a doubt that you, as trial jurors, can give a reason for having. If you have such a doubt as to the guilt of the defendant, you should acquit him; if you believe beyond such doubt that he is guilty, you should convict him of that offense of which you are so satisfied he is guilty." The vice of this charge is alleged to be in the definition of a reasonable doubt; and it is contended that the court's instruction was calculated to impress upon the jury that they must have a sufficient reason for doubting the guilt of the accused, whereas the true rule of law is that if the evidence leaves the reasonable mind wavering and unsettled, the defendant should be given the benefit of such a doubt. We see no error in this instruction. The very term "reasonable doubt" imports a doubt for which a reason may be ascribed. *Vann* v. *State,* 83 *Ga.* 45 (9 S. E. 945) ; *Fletcher* v. *State,* 90 *Ga.* 468 (17 S. E. 100).

5. Another excerpt from the charge which is criticised is this: "Under that rule, gentlemen, you look and see whether any witness in the case has or has not been impeached. If a witness has been so successfully impeached and has not been corroborated in one of the ways I have explained to you, it would be your duty to disregard the testimony of that witness; but whether a witness has been so successfully impeached, and, if successfully impeached, whether such witness has been corroborated, and what weight you will give to the testimony of that witness, under all the facts and circumstances of the case, is a matter for you to determine." The error in the charge is said to be that the jury was left to determine what weight they would give to the testimony of a witness who had been successfully impeached, whether or not such witness had been corroborated or sustained in any of the ways pointed out by law. There was no error in this charge. *Powell* v. *State,* 101 *Ga.* 19-22 (29 S. E. 309, 65 Am. St. R. 277) ; *Smith* v. *State,* 109 *Ga.* 479 (35 S. E. 59).

The verdict was amply supported by the evidence, and no sufficient cause is shown for reversing the judgment refusing a new trial.      *Judgment affirmed. All the Justices concur.*