20899. PENNINGTON *v.* THE STATE.

DECIDED DECEMBER 18, 1930.

*H. A. Woodward,* for plaintiff in error.

*W. Inman Curry, solicitor,* contra.

LUKE, J. The principal question presented by the record in this case is whether or not Fred Pennington is guilty of having, controlling, or possessing intoxicating liquor.

R. O. Story, a policeman of the City of Augusta, testified in substance that on April 9, 1929, he and others went to a cold-drink stand "on the 200 Block of Sixth street . . between Broad and Ellis streets, . . right in the rear of Washington Candy Kitchen on the corner of Broad and Sixth streets," in the City of Augusta; that there was only a little driveway between said cold-drink stand and said candy kitchen; that a search was made for whisky, and that they found "five gallons right upstairs over his (defendant's) place of business in a back room that had been used for a card or dice room, . . in a meal sack lying right over behind a table;" that they "went through his place, and went through the back door, and went up the back steps;" and that there was no one upstairs where the whisky was found. On cross-examination this witness swore: "I don't recall the number of the place. . . I testified as to that being Mr. Pennington's place. That is all I know it to be. I see him hanging around. He was not there when I went in. . . Of my own knowledge I can not swear that Mr. Pennington was the owner of that place or had anything to do with it—only what I heard. . . I went through the back door of what is supposed to be the cold-drink stand, and went up the back stairs. The whisky was found right over the cold-drink stand." On redirect examination this witness testified: "I have known this place as Mr. Pennington's place for about six years. I have seen Mr. Pennington hanging around there for about five or six years. . . You go in the front door and have to walk back, I reckon about twenty-five or thirty feet, and there is a big counter across the back, . . and you come in at Sixth street . . and there is a man standing back of the counter, and a big sink sets by this counter, and a door goes back in the back room, and you can go through that door to a yard, and there are steps that lead from upstairs right into the yard, and they use them two doors. As you go from Sixth street to this store the door that leads right in to these stairs is between the front door and the counter. You can step out in the hall and go up the front steps.

. . The place we found the liquor was right over the shop." This witness further testified that Mr. Pennington was not there, but that they arrested a man named Kelly, and "got a drunk out of there."

Luke Brown, referring to the cold-drink stand, swore: "I have seen Mr. Pennington down there lots of times hanging around the front. I don't know how long this place has been known as Pennington's place,—I believe, a couple or three years." This witness further swore that he went to said place with Mr. Matthews on April 6, 1929, and that Mr. Matthews "took a gallon of stuff out of a tub there to be analyzed;" that Mr. Pennington was not there, and that he could not swear that "he owned, conducted, or run that place," because the license was in a name other than that of the defendant, which witness did not remember.

After testifying that he was present when the whisky was found on April 9, 1929, Sergeant Farris swore: "I know Fred Pennington. . . On the 9th day of April last year his place of business was at 214 Sixth street, . . right back of the Washington Candy Kitchen. . . I have known this place as Fred Pennington's place for a couple of years. . . This place where the soft-drink counter is is 216. There is an upstairs to that. That number is 218; that is where the liquor was found. Let me explain it better. You come in the back, and you come in a room there. I know where Mr. Pennington's place is. At the front there the door leads into the soft-drink place, and another door right in the rear of that goes up stairs. There is not a door from the front as you go out of the soft-drink place that goes up stairs. You have to come out on the street and then go up to 218. When you go up the stairs right next to the soft-drink stand, it is toward Broad street. The room we found the liquor in is over the enlarged part of the garage. It is not over the soft-drink place. It is over the extension to the garage; a solid brick wall is built between the soft-drink place and the garage upstairs."

At this juncture the solicitor requested that the jury be allowed "to go and look at the place so they could understand it better." Counsel for the defendant said: "All right. I have also sent the officer who has testified about this back around there, as I was so thoroughly convinced he was wrong, so that he might again look at the situation." The jury examined the premises, and when the

officer referred to by counsel returned to court he testified that as he and Mr. Rainwater walked in the front door of the cold-drink stand, a man behind the counter broke two half-gallon jars of whisky. This same officer, Mr. R. O. Story, swore: "I noticed the license in that place; they were this year's license. I didn't pay any attention to last year's license; they are in the name of J. D. Shaw this year."

M. O. Matthews testified: that he went to what was known as Pennington's place on April 6, 1929, and found "potash with alcohol in it." He then swore: "I recognize that. It is potash with alcohol in it. I picked it up out of a tub in Mr. Pennington's place, 214 Sixth street. It was dumped in a boiler; . . it was about a gallon boiler. They dumped it in that potash in this tub." Here the solicitor stated that the thing found was being analyzed, but that the analysis had not been completed. The witness Matthews further testified: "I could not positively swear that Mr. Pennington owns this place—just seeing him around there constantly. He was there the day the raid was made.

Bill Key, called for the defense, testified: "I have been working at 214 Sixth street thirteen months. When I went to work there Mr. Barney Frost employed me. . . Mr. Frost was the owner of the place. Some two or three years ago Hal Fallow owned the place. Previous to that time Mr. Pennington owned it. He sold it to Mr. Fallow, and Fallow sold to Pennington again, and he sold back to Frost. Some time during the summer, . . several months ago, Frost sold to Shaw; and Shaw is the actual owner of the place, and I work for him. . . I just take the week's receipts and turn them over to Mr. Shaw. He lives in Graniteville, but he is in North Carolina now. He left last Saturday." After stating that he didn't know precisely where the whisky was found up stairs, but that it was found "in a room about four doors below our place," the witness Key further testified: "When this was scooped out of the place there, I was in charge. I have entered a plea of guilty to this offense. . . I don't sell whisky; I plead guilty because there was whisky in that jar there—there was something in there they said was whisky; they took it out of there. I had it in there in that tub, and they took it out and took me with it." W. J. Helner testified: that he worked for the Coca-Cola Bottling Company, and had been selling soft drinks at 214 Sixth street for several years; that he did not know who was the owner

of the place; that "quite a while ago" Shaw was there; and that Bill Key paid him for what he sold.

The defendant stated to the jury that he and his brother operated the place at 214 Sixth street for three months about "four years ago," but that they had sold the business to Mr. Fallow several years before, and that he had had nothing to do with it since. He said: "I have been welcome with the boys that run it, and I am around there quite often, it is true, and hang around there more than any other place. I like it better than the 700 or 800 block of Seventh and Eighth streets, as I have more parking space, and there is a telephone around there; and I have a lot of people who live out in the country that like to see me when they come in town to get what produce and stuff they need for the farm, . . and come there to find me. But I have no connection with the place whatever."

W. W. Wright, sworn for the State, testified: "I work down there at the cold-drink stand, 214 Sixth street. . . I was employed by Mr. Shaw. I don't know how long Mr. Shaw has been out of business; it is not his business yet. I have not seen him in a year. . . I have not heard of his being here in a year's time. If it is his business, or if it is changed, I don't know. I never heard of any one remitting him any money. . . I was there yesterday when Mr. Story and Mr. Rainwater came in; there was no liquor broke. . . It is not Mr. Pennington's place; he is not interested in it that I know about; he does not pay me any salary. . . I get $20 a week; I work more time than Mr. Key does."

The State introduced the telephone directory of the City of Augusta for the fall and winter of 1929, which listed the telephone at 214 Sixth street in Fred Pennington's name. F. B. Patterson swore: "I am employed by the . . telephone company in the capacity of office manager. . . I have a contract for the telephone at 214 Sixth street in the name of F. C. Pennington. His contract was signed on July 6, 1928. There has been no change in that contract since that time." After testifying on cross-examination that there had been instances in which a telephone remained in the name of a person who had sold out his business, this witness swore, on direct examination: "This is the last issue of the Augusta telephone directory. If any change had been reported in this contract, it would be on this card here. There may be

other telephones at 214 Sixth street, but this is the one covering telephone number 2986 at that location, and Mr. Pennington contracts to pay for that telephone."

We have not stated the testimony of all the witnesses. Neither have we set out all the testimony of the witnesses mentioned. However, we have, we think, presented enough of the testimony to indicate the salient features of the case. To our way of thinking, the numerous witnesses testifying were surprisingly unsuccessful in showing clearly the location of the room upstairs where the whisky was found in the sack with reference to the soft-drink place below. However, the jury inspected the premises, and, no doubt, had a clearer idea of this matter than has this court. The case is not as strong as it might be, but, it being peculiarly the province of the jury to sift and weigh the evidence, this court can not say that the evidence does not support the verdict. Therefore we hold that the trial judge did not err in overruling the general grounds of the motion for a new trial.

The first ground of the amendment to the motion for a new trial is merely an elaboration of the general grounds and needs no separate consideration.

The next ground is this: "That at the conclusion of the testimony, the arguments of counsel, and after the judge had charged the jury, and had ordered them 'to retire and make up their verdict,' the solicitor requested the court to detain the jury outside the court-room for a minute and before considering the case, as he had a matter to present to the court. The jury then retired from the court-room, under the order of the court. Then the solicitor said, 'If the court please, I ask that the jury be detained outside, as I have just discovered another piece of evidence, and I wish to ask the court whether or not you will permit me to introduce the telephone directory of the City of Augusta which shows the telephone at 214 Sixth street to be in the name of Fred Pennington.' Movant objected to the return of the jury after the court had formally delivered the case to them, and to the admission of such evidence at the time the same was offered, and did then and there urge the following grounds of objection: 'I object to the introduction of this directory on the ground that the case has already been submitted to the jury, and the solicitor now wishes to reopen it.' The court acceded to the solicitor's request, and, when the jury returned, admitted said directory."

It is within the discretion of the trial judge to reopen a case and permit the introduction of new evidence any time before argument is concluded, and the exercise of this discretion will not work a reversal unless it is manifest from the record that injustice has been done. The foregoing rule is fairly deducible from numerous decisions of the Supreme Court of this State, beginning with *Reid* v. *State,* 23 *Ga.* 190 (2). See *Fogarty* v. *State,* 80 *Ga.* 450 (13) (5 S. E. 782) ; *Johnson* v. *State,* 85 *Ga.* 561 (3), 563 (11 S. E. 844) ; *Powell* v. *State,* 101 *Ga.* 9 (3) (29 S. E. 309, 65 Am. St. R. 277) ; *Huff* v. *State,* 104 *Ga.* 521 (5), 524 (30 S. E. 808) ; *Frazier* v. *State,* 112 *Ga.* 868 (4), 870 (38 S. E. 349) ; *Hoxie* v. *State,* 114 *Ga.* 19 (9), 24 (39 S. E. 944). In *Harrison* v. *Powers,* 76 *Ga.* 218 (4), the court said: "The allowing of the reintroduction of a witness after both sides had closed their case, and after some argument and the intervention of a night, was a matter of discretion with which this court will not interfere, unless it is made manifest that the party objecting suffered serious detriment therefrom." It appears in the *Powers* case (p. 236) that a witness was reintroduced to show a fact which counsel had not overlooked, but which "he had considered immaterial." For an interesting and enlightening discussion of the right of the trial judge to reopen a case for the purpose of allowing evidence to be introduced, see *Strickland* v. *State,* 115 *Ga.* 222 (41 S. E. 713), where the jury were recalled after they had retired to consider the case, and a witness was "allowed to restate his testimony," to apprise the jury of a matter they had forgotten.

In the case at bar the jury had not reached the jury-room and entered upon a consideration of the case. This ground does not complain that the evidence was inherently improper, but only that it was too late to admit it. It does not appear that counsel for the accused was "surprised," or that he asked for either a continuance or delay in order to meet the testimony offered. As has been indicated, the trial judge has wide latitude in matters of this sort, and, in our opinion, the judge in this case did not abuse his discretion in admitting the evidence when he did.

The next and last ground of the amendment to the motion for a new trial is not complete and understandable within itself, and will therefore not be considered.

The evidence supports the verdict, no error of law was com-

mitted, and for no reason assigned did the court err in overruling the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*