## 26538. WREN v. THE STATE.

DECIDED JANUARY 7, 1938. REHEARING DENIED MARCH 29, 1938.

*C. Wesley Killebrew,* for plaintiff in error.

*George Hains, solicitor-general, E. J. Clower,* contra.

MacINTYRE, J. The defendant was convicted of having, possessing, and controlling intoxicating liquor. Briefly stated, the testimony of the witnesses for the State shows that on September 28, 1936, officers Joshua R. Cawley and L. H. Wilkins, armed with a search warrant against Charlie Wren and his place of business, raided "the Charlie Wren place, . . a place that has been operated by Charlie Wren out on the Milledgeville road." When the officers first arrived at the Charlie Wren place, which was in the nature of a tourist camp and a filling-station, they found A. R. Snuffer in charge of the place, and they read the warrant to him and told him they had a search warrant for the place. At the time the search was being made, Charlie Wren was not at the place, but Snuffer immediately picked up the telephone and called Charlie Wren, stating, "You had better come over here; the officers are raiding the place." In response to this call the defendant in about ten minutes arrived at the place being raided and asked the officers, "What is all this?" The officers told him that it was a raid, and read the warrant to him. In the search which occurred before the arrival of the defendant, various brands of liquors and gins were found on the premises.

In his statement to the jury the defendant admitted that he owned the place where the liquors were found, that he built it about two and a half years before, and ran it until July, 1935, when he had to go to the hospital, and that he had leased the property to Snuffer. He stated that he did not know that Snuffer was handling liquor "until he called me. He told me he was being raided, and of course he called me, and I went around to see about it, as I was renting the place to him and was interested in my property." He further stated that Snuffer "is up in Virginia where some of his family is sick, and as I understand it he is in-

tending to come back here and plead guilty, . . as it was his whisky." The defendant made no assertion that it was Snuffer's liquor in the presence of Snuffer and while the search warrant against Wren was being read to Wren, nor did the defendant deny that the liquor was his when the officers found it in the search which ensued. No witness was introduced to testify in the defendant's behalf. He denied his guilt. Further testimony of one of the officers as to whose place it was where the liquor was found is as follows: "I raided the Charlie Wren place. . . We raided a place that has been operated by Charlie Wren out on the Milledgeville road. . . It is a filling-station, tourist camp, known as Charlie Wren's tourist camp and cabins. . . The place goes under the name of Mr. Wren. I couldn't say who runs it. . . It is generally known as Charlie Wren's place. I don't know that to be a fact; but usually whenever I have a call at the jail at night about any trouble, they usually say that. Just say Wren's place. . . As to who runs the place that is called the Wren's place, the sign there is Wren's Tourist Camp. . . I have seen Mr. Wren and Mr. Snuffer both there at the time of September 28, 1936, and before that time within two years, when I went around there as an officer."

1. While wholly circumstantial, the evidence was sufficient to authorize the jury to find that it excluded every reasonable hypothesis except that of guilt. The cases cited in the brief of counsel for the plaintiff in error are clearly distinguishable by their particular facts from the instant case.

2. There is no merit in the special grounds of the motion for new trial. The overruling of the motion was not error.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*

### ON MOTION FOR REHEARING.

MacIntyre, J. With reference to ground 1, the plaintiff in error's attorney quoted the direct testimony of the witness Cawley as being: "Mr. Snuffer called somewhere over the 'phone, I don't know where, and Mr. Wren came down there while we were there." Counsel claims that the witness Cawley did not testify at that time that Snuffer called Wren, and that this court overlooked and misconstrued the record when we stated that Snuffer called Wren at that time over the 'phone. Counsel inadvertently has misquoted the testimony of Cawley, for Cawley's testimony was, "Mr. Snuffer

called *Charlie Wren* [italics ours] somewhere over the 'phone—I don't know where—and Mr. Wren came down there." In addition to this, when the witness Cawley was thereafter recalled as a witness he testified, "On the date of the raid, Mr. Snuffer called Mr. Wren and he came there in about ten minutes afterwards." There is no merit in this ground.

With reference to grounds 2 and 3 of the motion for rehearing, L. H. Wilkins, witness for the State, testified: "I was with Mr. Cawley on this raid on the 28th of September, 1936. We went there with a search warrant, which I have in my hand against Charlie Wren. We went on the Milledgeville Road just beyond the intersection of Fifteenth and Milledgeville Road. There is a filling-station, tourist camp, *known as Charlie Wren's Tourist-Camp,* and cabins. With this search warrant we found Mr. A. R. Snuffer in charge of the place. We read the warrant to him and told him we had a search warrant for the place. He told us to go ahead and we commenced searching and under the counter of the place we found about two or three cases of rye liquor, consisting of 10 pints of Wilkerson's Family, 12 one-half pints of the same brand, 8 pints of Crab Orchard, 6 pints of the Old Quaker Gin, 6 pints of Corbett, 9 pints of Seagrams's and 11 pints of Corbett, 3 quarts of Hiram Walker, 11 pints of Cream of Kentucky, 8 pints of gin, 6 pints of Mr. Boston, 6 one-half pints of Bottoms Up. There wasn't a full case of any of it. This was supposed to be intoxicating liquor. Charlie Wren was not at the place. Mr. Snuffer picked up the telephone and called somewhere—I don't know where—and said to some one, 'You had better come over here, the officers are raiding the place.' So I imagine ten or fifteen minutes after that Mr. Wren came in and asked me and Mr. Cawley and Mr. King, 'What is all this?' And we said, 'It is a raid,' and we taken the search warrant and read it. That happened in this State and county." In the opinion, this court stated *"that the defendant made no assertion that it was Snuffer's liquor in the presence of Snuffer and while the search warrant against Wren was being read to Wren* nor did the defendant deny the liquor was his when the officers found it in the search which ensued." Plaintiff in error's attorney contends that the first sentence above italicized was a misconstruction of the record in that the search warrant was not read to Wren. It is true that the wit-

ness Cawley testified, "Mr. Wren came in the place, if I remember correctly, and said 'What is all this?' And we told him a raid. That is all he said." But the State's witness Wilkins testified, "That after that Mr. Wren came in and asked me and Mr. Cawley and Mr. King, 'What is all this?' And we said, 'It is a raid' and we taken the search warrant and read it." After the verdict, the testimony is construed in its most favorable light to the prevailing party, which in this case is the State, for every presumption and inference is in favor of the verdict. *Bell* v. *State,* 21 *Ga. App.* 788 (95 S. E. 270). It thus seems to us that a fair and legitimate construction of the testimony, according to this rule, is that the search warrant was then and there read to the defendant as a part of the response to his question, "What is all this?" Counsel for the plaintiff in error further contends, with reference to this ground of the motion, that even if the search warrant were read to Wren, as stated by the court, the mere fact that he made no assertion did not indicate and should not be construed as evidence of his guilt. While we do not think it could be said that this was any confession on the part of the defendant, yet we think it was a circumstance which, when taken with all the other facts and circumstances and the defendant's statement, the jury could take under consideration to determine whether or not the defendant was guilty. The plaintiff in error's attorney further contends in ground 3 that the last part of the above statement by the court, to wit, "nor did the defendant deny the liquor was his when the officers found it in the search which ensued," was a misconstruction of the record and that the proper construction thereof should be, "Wren was not at the place at the time of the finding of the liquor and it was after the liquor had been found that Snuffer picked up the 'phone and called 'somewhere.'" We construed the testimony of Wilkins quoted above to be in effect that the officers had a search warrant against the defendant Charles Wren, and they went to the filling-station or tourist camp known as Wren's Tourist Camp, and cabins; that upon the arrival there, they found Snuffer in charge of the place and read the search warrant to him, and he told them to go ahead and they "commenced searching;" that on the premises they found a large quantity of liquor; that when the search first began, or while it was going on, Snuffer 'phoned the defendant and stated to him, "You had better come

over here, the officers are raiding [not have raided] the place," and that in ten or fifteen minutes thereafter Wren came in there and asked Wilkins and Cawley, "What is all this [all what]?" We construed the statement "we taken the search warrant and read it," as meaning the officers read the search warrant to the defendant as further explanation of the reply to the defendant that "It is a raid." It seems to us that the raid was not likely to have been completed within ten minutes after it began, under the circumstances disclosed in this case, and if the defendant arrived on the scene within ten minutes after he was telephoned by Snuffer and made the inquiry, "What is all this?" it would indicate to our minds that the raid was still incomplete and that a part of the raid ensued after the defendant had arrived and made this inquiry. The defendant knew the liquor had been found on the premises during the raid (see also the defendant's statement "I didn't know he was handling liquor until he called me and told me he was being raided"), and whether it was found before or after the defendant's arrival), the jury might consider his failure to deny that it was his as a circumstance which would militate against him. Hence our statement, "nor did the defendant deny the liquor was his when the officers found it in the search which ensued," is, we think, a proper interpretation of the evidence. The instant case is distinguished from *Burke* v. *State*, 54 *Ga. App.* 225 (187 S. E. 614). In that case there was no evidence of probative value that the place belonged to the defendant or that he did or said anything that would indicate that the whisky or beer was his. The facts in *Pennington* v. *State*, 42 *Ga. App.* 377 (156 S. E. 286), are more nearly applicable to the facts of the instant case.

*Rehearing denied. Broyles, C. J., and Guerry, J., concur.*